WASHINGTON RAILWAY & ELECTRIC CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 92435. Promulgated December 22, 1939.

1250

*Nelson T. Hartson, Esq.*, for the petitioner.
*Hartford Allen, Esq.*, and *E. C. Morison, Esq.*, for the respondent.

OPINION.

KERN: The narrow question here raised is whether, petitioner having received an award on January 13, 1930, from the Government in excess of the cost of its land and improvements used in supplying electric power to its street railway line and street lighting system and to individual patrons, including the Government itself, and having expended a total sum in replacement in excess of the award, is entitled to treat that part of the total replacement cost spent before the award was made as replacement cost within the meaning of section 112 (f) of the Revenue Act of 1928. The Government freely concedes petitioner's right to do so with moneys spent after the award. Article 579 of Treasury Regulations 74, which is pertinent here, is set out in the margin.[2]

Respondent apparently raises no question of petitioner's expenditures having been made to replace property about to be taken over by the Government, of the conversion being involuntary, of the similar character and service of the property replaced, or of the threat or imminence of the condemnation at the time the replacements were made. If any such question were raised, it could easily be answered by reference to our findings, which show beyond doubt that in all these respects petitioner fell within the provision of the statute, nor can there be any doubt on the facts that the maintenance by petitioner of its public utility service to the Government and to its other customers made a sudden and abrupt change in the place of operation of its substation impossible. The shift had to be brought about so as to prevent interruption of its functions as a public utility and had to be done gradually, since the technical difficulties were substantial. New land had to be acquired, new buildings constructed, and in some instances new machinery built according to special designs in order

---

[2] ART. 579. *Involuntary conversion of property.*—Section 112 (f) deals with cases in which property is compulsorily or involuntarily converted into similar property, or into money, as a result of fire, shipwreck, theft, condemnation, or similar causes enumerated in the Act. If the property so destroyed, stolen, seized, or condemned is replaced in kind by similar property or property related in service or use, no gain or loss is recognized. If, however, the original property is compulsorily or involuntarily converted into money, gain or loss will be recognized unless the money is forthwith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended—

(1) In the acquisition of other property similar or related in service or use to the property so converted,

(2) In the acquisition of control of a corporation owning such other property, or

(3) In the establishment of a replacement fund.

If any part of the money is not so expended, the gain, if any, shall be recognized, but in an amount not in excess of the money which is not so expended. See article 601 for the basis for determining gain or loss from the sale or other disposition of the property so acquired.

to reduce to a minimum the inevitable noise of operation in a residential part of the city. New mains and trunk lines had to be built for the new power substation while the load of the old was gradually distributed among existing substations near the condemned one so that service would continue without interruption. All these things were done after it became apparent, through the enactment of the Act of Congress providing for condemnation of the land under its power of eminent domain should it prove necessary, that the petitioner could no longer hold it or continue to use it. Some of the replacement was done before the payment was made on the so-called "sale"— for with the exercise impending of a power eminent over all private rights, the sale was one in form only and not a bargain freely arrived at between a willing buyer and a willing seller—and some of the replacement after the receipt of such payment. The respondent concedes the statutory propriety of the latter but challenges the former solely on the ground that money used to acquire new and similar property for a similar use in anticipation of an involuntary conversion of the taxpayer's existing property into cash is beyond the statute, whereas money received as part of such an award and thereafter expended in replacement is within it.

We think that so narrow a construction loses sight of the ameliorative intent of the provision. A relief provision should be construed liberally to effect its purpose. *Helvering* v. *Bliss*, 293 U. S. 144; *United States* v. *Pleasants*, 305 U. S. 357, 363. Nor does the statute in literal terms require that the award shall be paid and then, and not until then, used for replacement. It says that "if property (as a result of * * * an exercise of the power of requisition or condemnation, *or the threat or imminence thereof*) is compulsorily or involuntarily converted into property similar or related in service or use", no gain shall be recognized. (Italics ours.) Applying this language to the present situation, we must conclude that if petitioner had exchanged its substation, office building, laboratories, garages, etc., for other like buildings, there would have been no gain, for it would have been immaterial that condemnation had not taken place and the award had not then been made. *Davis Regulator Co.*, 36 B. T. A. 437, 443. So, also, it is clear that if the buildings had been converted "into money which is forthwith in good faith * * * expended" in like property, there would have been no gain; and it is such a conversion by the payment of the award and its immediate reinvestment by petitioner which respondent has recognized here.

But respondent insists that money still unpaid can not be forthwith reinvested nor property still in petitioner's ownership converted into other property, although the old property was at the time con-

cededly subject to an imminent compulsion. We think otherwise. As we intimated, but did not decide, in *Francis V. duPont et al., Executors*, 31 B. T. A. 278, 280:

It might be that an expenditure in anticipation of involuntary conversion, where such conversion is imminent, might be found to be closely enough related thereto to come within the nonrecognition provisions.

We think that the situation here justifies the application of this principle. The petitioner's property in the old power substation and other buildings in the doomed area was, in our opinion, as much "converted" by and at the time of the purchase of new buildings intended for the same use as though they had been then exchanged for the new buildings; and this "conversion" having taken place after the threat of the exercise of the sovereign's power became imminent, for the authorizing Act of Congress spoke of condemnation or otherwise "at an early date," and the Treasury officials left no doubt in the minds of petitioner's officers that delay would not be tolerated, the fact that the petitioner retained until the so-called "sale" to the Government a bare legal title to the old buildings and land can not obscure the fact that the involuntary conversion was already, for all practical purposes, complete and that practical public considerations alone made necessary the postponement for a brief spell of the surrender of petitioner's title. The case is a close one, but any other conclusion would defeat the remedial intendment of the provisions in circumstances which we think were obviously intended to be embraced within it.

Even though we consider the situation here covered by that part of the statute having to do with the conversion of the property into money which is forthwith expended in the acquisition of similar property, we can see no reason compelling us to make so illiberal a construction of the statute as to conclude that the relief provided by it and intended by Congress is not available to petitioner. To do so it would be necessary to construe the word "forthwith" as meaning "afterwards", that is, after the actual conversion and the receipt of the award. The dictionary defines "forthwith" as follows:

Immediately; without delay; directly; hence, within a reasonable time under the circumstances of the case; promptly and with reasonable dispatch.

According to this definition it seems apparent that Congress, by the use of the word "forthwith", meant to provide that the expenditure of money resulting from the involuntary conversion of property in the acquisition of similar property must be made with some immediate chronological relationship to the conversion, thereby guarding against such a long delay *after* the conversion as to raise a doubt whether the purchase of similar property was actually and in good faith a replacement, or was an additional investment. If there is that immediate

chronological relationship between the expenditure for replacement and the condemnation or threat thereof, it is immaterial that the expenditure for replacement immediately preceded the payment of the compensation or immediately followed it. Upon this general subject see *August Buckhardt*, 32 B. T. A. 1272; *M. J. Caldbeck Corporation*, 36 B. T. A. 452.

Respondent leans heavily on two decisions of the Court of Appeals for the Second Circuit as supporting an opposite view. There are peculiar circumstances in the first of these cases which, notwithstanding a certain generality in the court's language, distinguish it in principle from the instant case.

The statute in the section considered speaks of the requirement of "good faith," but even if this were absent, it would follow necessarily that a taxpayer seeking to avail himself of a relief provision, which is a matter of grace and not of right, may not abuse it. And by the same token, a relief provision although liberally construed so as to effect its alleviatory purpose should not be so loosely construed as to make easy its abuse by taxpayers acting *mala fide*. Probably all men would agree on the difference between these extremes, but when the line between approaches the mean, the question of where it should be drawn is a question of degree, and as to that reasonable men may differ. Cf. Holmes, J., in *Klein* v. *Board of Tax Supervisors*, 282 U. S. 19, at page 22. We think, however, that the principal case relied on by respondent, *Bandes* v. *Commissioner*, 69 Fed. (2d) 812 (C. C. A., 2d Cir.), affirming 28 B. T. A. 99, when compared with the situation in the instant case, well illustrates where the distinction lies between liberal interpretation of a relief provision and loose construction which lends itself to abuse. In that case the petitioner, his brother, and another acquired in 1926 certain land in New York City which they intended to convey to a wholly owned corporation which should build an apartment house on it. Before construction was begun, however, the city condemned the land for a school site, proceedings starting in January 1927 and title passing in February, but the award not being confirmed until June 1928. The award was paid in July and each brother realized a gain recognizable if section 112 (f) did not apply. The brothers, after learning that condemnation was imminent, looked for other property on which to build an apartment house. The best they could do was to buy two separate parcels of about the same total area, and by March 1927 they had contracted to buy both and had taken title to them by May of that year. Construction was begun on one in June and on the other in the fall of the same year. The brothers made advances to the apartment house corporation for the work, and when the award was paid them they deposited it in their joint bank account to offset these prior advances. The Circuit Court

held that this application of the award did not satisfy the statute, saying (at page 813):

Replacement by the taxpayer must refer to his use of the money paid for the property, because, if replacement by the taxpayer out of any of his funds were considered a conversion in kind, there would be no conversion into money, for the two alternatives are mutually exclusive. In the case at bar there was clearly a conversion of the condemned property into the money paid for it by the city, and the inquiry must be whether the petitioner expended the money in the manner required by the statute as a condition precedent to nonrecognition of gain or loss.

It is tempting to say that, if a taxpayer buys lot B on borrowed money and pays the debt with the award he gets for the condemnation of lot A, he has acquired lot B with the award. Whether the statute will permit of such a construction we need not now decide. To sustain the petitioner in the present case, we should have to construe it even more broadly and say that a taxpayer may use any of his funds to buy the new property, and, when he recoups the expense by receipt of the award, regardless of how it is actually expended, the new property may be considered to have been acquired out of the award. This would leave nothing to the statute except that the taxpayer must acquire new property with an intent to substitute it for the old. The language is much too specific to be capable of that construction * * *

The generality of the language employed might indicate that the Circuit Court thought that the use of other money to procure new property of a like nature and use, unless, as it suggests, that money was not the taxpayer's but only borrowed, would not comply with the provision's requirement. In other words, the "conversion" would not be the procurement of new like property under the threat of loss of the old, but the actual translation of the old property into cash and the translation of that specific cash into new property, a sequence of acts which would make impossible any anticipatory replacement such as we have in the instant case. With this view we disagree, but we do not think that *Bandes's* case on its facts and apart from its language requires such a conclusion.

There the taxpayer had made no use of his land to build an apartment house before its condemnation. He might have acquired it for merely speculative purposes, with the intention of resale at a profit. The conversion of it into cash by condemnation was clearly involuntary, but we would have only the taxpayer's statement of his intention to use the land for an apartment house to justify us in saying that the new land was a true replacement. If the benefit of the statute were extended to such cases, the way would be left open to the postponement of taxation of gainful transactions in no substantial way different from voluntary sales where the gain is immediately recognizable. In the instant case, the nature of the taxpayer's business requiring replacement and interim maintenance of public services and the use of the new property for the same purposes as the old, guarantees the *bona fides* of the anticipatory rein-

vestment of the proceeds of involuntary conversion. The line may not always be an easy one to draw, but here seems certain. The distinction after all between that case and this is one of reality and not of merely formal logic, and taxation as a practical matter should look to realities.

Another factual distinction between *Bandes's* case and the instant proceeding is apparent from a reading of the following significant passage in the opinion of this Board accompanying the decision which that case affirmed, reported in 28 B. T. A. at page 99:

But there may be room for doubt whether the statute is to be so strictly read as to preclude its application to a case where the taxpayer has been forehanded enough to provide for the replacement without waiting for the ultimate and complete consummation of the condemnation and payment. How important the precise sequence of events alone may be under this statutory provision need not be decided in this proceeding. These petitioners were not in the position where, to put themselves where they would have been but for the condemnation, they used the proceeds of the award to buy similar property or to pay for such property which they had already bought. So far as this record shows, the two latter parcels were bought and paid for with separate and free funds and sold to the Naside corporation, a transaction like others in which the petitioners were customarily engaged. The condemnation compensation was not used either to buy or to pay for similar property, but was invested in a loan to the Naside corporation, a separate entity, *Burnet* v. *Clark*, 287 U. S. 410. Nothing in such circumstances indicates the enforced transaction or the hardship which this provision of the statute was designed to alleviate. * * *

Also, it may be doubted whether the facts of *Bandes's* case constitute a replacement within the meaning of the statute. Rather, it would seem to be an anticipatory substitution of one investment for another. If the taxpayer in that case had constructed and was operating an apartment house and a necessary and component part of it, such as a garage or a kitchen wing, was to be condemned, and in anticipation of this the taxpayer had constructed another garage or kitchen wing to take the place of the one to be condemned for the purpose of effectively continuing the operation of his apartment house, then there could be no question but that there had been a replacement. However in *Bandes's* case the taxpayer had not constructed and was not operating an apartment house. He intended to make an investment in one but before he could do so it became apparent that it would be impossible for him to make the investment in the form and at the location which he intended. Thereupon, he decided to invest instead in the construction of two other apartment houses at two other locations. It may be that his intention to invest in the first apartment house was replaced in his mind by the later intention to invest in the two apartment houses which were actually constructed, but it is difficult to understand how these two apartment houses could be considered as replacing an apartment house which was never built,

within the meaning of this section of the statute. Perhaps it is this difficulty which led the Circuit Court in *Bandes's* case to use the language it did in the second paragraph of that portion of its opinion which we have already quoted.

That difficulty is not present in the instant proceeding because the petitioner's investment in a public utility company continued unchanged. It was merely necessary to replace some indispensable component parts in the physical plant of that company in order to continue its operation.

The respondent's second reliance, *Wilmore S. S. Co.* v. *Commissioner*, 78 Fed. (2d) 667, reversing 30 B. T. A. 866, was decided by the same Circuit and is even more doubtful as authority. There the taxpayers had sustained a loss of certain ships through sinking by a German submarine in war in 1917. An award was paid to the taxpayer in August 1928 in accordance with the terms of an Act of Congress in settlement of war claims. The taxpayer had contracted for the building of new ships in June 1928 before the award and payment was made, paying for them by installments, and by the end of that year had paid more on their construction than the amount of the award. "As the payments were to be by installments", the court said, "it must be assumed that nothing was paid in advance." And after holding the new ships to be a replacement within the statute the court concluded with this explanatory limitation on its decision in *Bandes's* case:

Our decision in *Bandes* v. *Commissioner*, 69 F. (2d) 812, is not contra. It went no farther than to hold that under section 112 (f) of the Revenue Act of 1928, a taxpayer could not claim an exemption for any profit realized in a condemnation proceeding if he used the profit merely to repay his own prior expenditures *in purchasing similar property.* [Italics supplied.]

It would appear from this quotation that the Circuit Court for the Second Circuit intends to limit the rule of *Bandes's* case to its peculiar facts. If, in addition to the fact that "similar property" was purchased, it also appears, as in this proceeding, that the "similar property" was necessary to replace and did replace property used in the operation of a continuing investment in the form of an existing public utility company, we have a situation which would seem to be outside the orbit of that case.

We wish to again point out and stress the fact that petitioner here is operating a public utility and hence may not suspend service without incurring serious consequences to itself and grievous inconvenience to the public. Therefore it is of compelling importance to it to anticipate wherever possible necessary replacements in its plant and equipment.

No other cases dealing with the precise question here have been called to our attention, nor have we found any. As we pointed out

at the outset, the very reason for enacting a relief provision requires that it be liberally construed; and where the circumstances of the case preclude all possibility of a fraud being practiced on the statute, we can perceive no valid reason why section 112 (f) does not comprehend an anticipatory conversion of condemned (or about to be condemned) property into new property such as happened here before the award was paid; at least, under the circumstances present in this proceeding, and we so hold.

It must follow that there is no deficiency in petitioner's income tax liability for the year 1930, and, also, that petitioner has overpaid its taxes for that year.

Reviewed by the Board.

*Decision will be entered under Rule 50.*