Dominguez Estate Company v. Commissioner.
Dominguez Estate Co. v. Commissioner
Docket No. 92329.
United States Tax Court
T.C. Memo 1963-112; 1963 Tax Ct. Memo LEXIS 232; 22 T.C.M. (CCH) 521; T.C.M. (RIA) 63112; April 18, 1963
A. Calder Mackay, Esq., 523 W. 6th St., Los Angeles, Calif., and Adam Y. Bennion, Esq., for the petitioner. Robert L. Gnaizda, Esq., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: A deficiency of $293,304.32 in petitioner's income tax for the year 1957, all of which is in dispute, has been determined by the respondent. The only issue is whether certain real property was sold by the petitioner to the County of Los Angeles, California, under threat or imminence of condemnation so that it qualified as an involuntary conversion under section 1033 of the Internal Revenue Code of 1954. The parties have stipulated that within the time permitted by law the petitioner invested funds received from the County of Los Angeles in the acquisition of replacement property *233 similar or related in service or use to the converted property. Findings of Fact Some of the facts were stipulated and are so found. Dominguez Estate Company (hereinafter called petitioner) is a corporation organized and existing under the laws of the State of California. Its principal business activity is owning real estate for investment. For the taxable year 1957 the petitioner filed its corporation income tax return with the district director of internal revenue, Los Angeles, California. On May 1, 1956, the Board of Supervisors for the County of Los Angeles issued an order instructing its Chief Administrative Officer and the Los Angeles County Parks and Recreation Commission to contact petitioner for the purpose of determining what plans it had, as owners, for the development of a 204-acre parcel of land lying approximately 350 feet south of 189th Street between Main Street and Avalon Boulevard in the Dominguez area. Included in the 204-acre parcel were 6.41 acres of land belonging to the petitioner against which the Board of Supervisors later (November 27, 1956) authorized the institution of condemnation proceedings for the development of a park site to be known as Victoria *234 Park. On May 24, 1956, Charles M. Crawford, the general manager of petitioner corporation, met with representatives of the Board of Supervisors and the Parks and Recreation Commission to discuss the County's plan for acquiring the property for a public golf course and recreation area. During these discussions the County officials were advised that the petitioner did not wish to sell the property, but preferred to lease it for 20 years. It was clearly indicated at the meeting that the County possessed the right of condemnation and would exercise such right unless satisfactory arrangements for acquiring the needed property could be made. The County negotiators stated that a 40-year lease might be acceptable. By letter dated June 12, 1956, the petitioner formally offered to give the County a 20-year lease. This offer was rejected in a later conference held with County Supervisor Burton W. Chase, who advised petitioner's representatives that perhaps a 30-year lease with an option to purchase would be acceptable to the Board of Supervisors. This plan was approved by petitioner's Board of Directors on July 10, 1956, and made known to the County in a letter dated July 13, 1956. However, *235 after further negotiations, the County representatives reiterated that the County preferred to own the property. At another meeting in January 1957, the County representatives, acting pursuant to the directions of Burton Chace, threatened to acquire the property by condemnation. In order to avoid the costs of such a proceeding, the petitioner advised the County in February 1957, that it had made arrangements with the owners of a parcel of land, comprising some 65 acres, known as the "Eiler's property," whereby the petitioner would exchange its land for the Eiler's property, and the County could then acquire the 204-acre Dominguez parcel for $1,300,000. The County refused such request and by letter dated June 3, 1957, informed the petitioner as follows: * * * It is the intention of the County to proceed to condemnation in order to acquire the subject property if a purchase cannot be negotiated. This office recently contacted Mr. McCumber of the Bureau of Internal Revenue, Treasury Department, of the United States Government. Mr. McCumber stated that a sale of real property made by an individual or a corporation to a public body for public purposes is considered by the Treasury *236 Department to be an involuntary conversion regardless of whether or not an action in condemnation is filed with the County. The Board of Directors of the petitioner corporation adopted the following resolution on June 5, 1957: WHEREAS, the company has been advised by the Chief Administrative Officer of the Property Management Division of the County of Los Angeles that condemnation proceedings will be commenced immediately to acquire from this Company that certain 204-acre parcel of land lying westerly of Avalon Boulevard and southerly of Tract 16879 as shown on map recorded in Book 488, pages 26 to 28 of Maps, in the office of the Recorder of the County of Los Angeles; and WHEREAS, it is deemed inadvisable to resist the County and incur unnecessary expenses in defense of such condemnation proceedings; NOW, THEREFORE, BE IT RESOLVED that the President and the Secretary be and they hereby are authorized to negotiate with the County for the sale of the above described property and to execute any and all deeds, contracts or other instruments necessary to consummate this sale. Again in order to avoid the expenses of such proceedings and to effect and facilitate the proposed exchanges, *237 the interested parties opened two escrows with the Title Insurance and Trust Company. In the first escrow the petitioner deposited its deed in favor of the County of Los Angeles and the County deposited the sum of $1,300,000. The owners of the Eiler's property deposited their deeds in favor of petitioner in the second escrow, into which was then transferred the $1,300,000 from the first escrow. Thus, on August 8, 1957, the property here involved was acquired by the County of Los Angeles after the Notice of Intent to Purchase was published in the Wilmington Press Journal on July 18, July 25, and August 1, 1957. No condemnation proceedings with respect to the property were ever filed in court. Petitioner did not include the gain from the sale of the property as taxable income in its corporation income tax return for 1957. The respondent, however, in his notice of deficiency determined that a gain of $1,173,217.27 should have been included in petitioner's taxable income for that year because the sale did not qualify as an involuntary conversion under the provisions of section 1033, Internal Revenue Code of 1954. Opinion Whether property is converted under *238 a threat or imminence of condemnation is a question of fact with the petitioner having the burden of proof. We think this petitioner has met its burden with clear and convincing evidence. Relying on Rev. Rul. 58-557, 1958-2 C.B. 402, the respondent first advances the argument that, since the Board of Supervisors for Los Angeles County had not indicated by public resolution or public act that the petitioner's property would be condemned, there was no "threat or imminence" of condemnation within the meaning of the statute. This argument is not persuasive. We considered and rejected it in Frank O. Maixner, 33 T.C. 191 (1959), where we said at page 195: In the same vein, it is our view that Rev. Rul. 58-557 (1958-2 C.B. 402) is too restrictive in the requirements therein set forth. Section 1033, and its prototype in other revenue acts, "was designed to prevent an inequitable incidence of taxation." Washington Market Co., 25 B.T.A. 576 (1932). Being a relief provision by which a taxpayer may postpone the taxation of so much of the gain derived from an involuntary conversion as it uses in replacement, we believe it should be liberally *239 construed to effectuate its purpose. Paul Haberland, 25 B.T.A. 1370 (1932). We are unwilling in this setting to circumscribe so severely the plain words of the statute in the narrow manner urged by the respondnt. Certainly, the "threat or imminence" must be a real exercise of the power of condemnation, sufficient to create a legal compulsion. But "threat," as used in this context, means a declaration of intention to condemn private property for public use. "Imminence" denotes something that is ready to happen; near at hand; impending. In determining whether a "threat or imminence" of condemnation existed in this case, we are impressed by these facts: That the Board of Supervisors of Los Angeles County was authorized by law to exercise the power of eminent domain; that, acting through Supervisor Burton Chace, the Board intended to acquire the petitioner's property; that, if it could not negotiate the purchase, condemnation proceedings would be instituted; and that it was reasonable for petitioner to infer that the County representatives were acting within the scope of their authority and pursuant to the directions of Supervisor Chace so as to make it likely that their *240 "threats" could and would be carried out by the Board of Supervisors if the purchase of petitioner's land could not be negotiated. Respondent contends that what occurred here is something far less than a public body acting. We disagree. The documentary evidence and the corroborating testimony of Charles M. Crawford, Gregory Lins, and Burton W. Chace establish that the actions taken were certainly those of a "public body," acting in accordance with its power of eminent domain, which was seeking to acquire this land for a public golf course and recreation area. Respondent also asserts that the "unauthorized remarks" of Gregory Lins can hardly be considered a "threat." This is a completely hollow argument wholly unsupported by the evidence. We have no "artificial" threat here. There was no collusion between the local government officials and this petitioner to create a threat of condemnation so that the transaction would qualify as an involuntary conversion. In every sense this was a real threat. While the facts here are not quite as strong as those in the companion case of Carson Estate Company, T.C. Memo. 1963-90, we nevertheless feel that the result must be the same. *241 The factual pattern in this case falls within the ambit of our decisions in Frank O. Maixner, supra, and Davis Regulator Co., 36 B.T.A. 437 (1937). Cf. Washington Railway and Electric Co., 40 B.T.A. 1249, 1253 (1939); Piedmont-Mt. Airy Guano Co., 8 B.T.A. 72 (1927); and The Davis Co., 6 B.T.A. 281 (1927). Based on the record before us, we hold that the sale was made because of the "threat or imminence" of condemnation. The respondent's determination must therefore be disapproved. Decision will be entered for the petitioner.