## WILMORE S. S. CO., Inc., v. COMMISSIONER OF INTERNAL REVENUE.

### No. 282.

Circuit Court of Appeals, Second Circuit. July 15, 1935.

CHASE, Circuit Judge, dissenting.

On September 12, 1917, the Wilmore, an ocean-going collier belonging to the petitioner, was torpedoed and sunk by a German submarine. The taxpayer recovered in that year $1,750,000 marine and war risk insurance for the loss and reported the difference between the original cost of the steamer (less depreciation) and the amount of the insurance paid, as part of its gross income for the year 1917. After the organ-

ization of the German-American Mixed Claims Commission, the petitioner filed a claim for the loss sustained through the destruction of the steamer, and on February 17, 1926, the Commission entered an award, in the sum of $650,000 and interest, being the excess of fair market value of the steamer at the time of the destruction over the $1,750,000 of insurance moneys. In 1928 the award was certified to the Treasury Department for payment under the Settlement of War Claims Act of 1928 (45 Stat. 254), and there were paid to the taxpayer on August 6, 1928, $99,500, and on August 22, 1928, $252,841.77, from which was allowed a deduction of $40,184.17 for legal expenses incurred in the collection of the claim. The taxpayer did not include the balance of the payments from the award, amounting to $312,157.60, in its income tax return for 1928, but both the Commissioner and the Board found it subject to taxation and the deficiency fixed by the Board was because of failure to include it. The taxpayer contended that it should not have been included because it was derived from a gain realized through the involuntary conversion of the collier Wilmore into money thereafter expended in the acquisition of other steamers similar in service to the one destroyed. If such was the case no gain should be recognized under the provisions of section 112 (f) of the Revenue Act of 1928, 26 USCA § 2112 (f).

Section 112 (f) provided that: "If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, * * * no gain or loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized, but in an amount not in excess of the money which is not so expended."

Article 579 of Treasury Regulations 74 promulgated under the Revenue Act of 1928 provided that:

"* * * If * * * the original property is compulsorily or involuntarily converted into money, gain, or loss will be recognized unless the money is forthwith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended—

"(1) In the acquisition of other property similar or related in service or use to the property so converted; * * *."

Before the Board, the parties stipulated among other things as follows:

"11. On June 30, 1928, petitioner entered into contracts for the construction, in an American Steamship Yard, of two coal carrying ocean-going steamships * * * intending to apply to such construction all sums to be received as payments on account of the award of the Mixed Claims Commission. The total contract price * * * was $1,496,800, payable in installments as the work progressed, * * * the total cost of said steamers to December 31, 1931, was $1,683,018.34. Payments by the petitioner, under said contracts, during the year 1928 amounted to $484,652.57. Said new steamships have since been completed and are now in service and owned by petitioner.

"12. * * * In the return filed for the year 1928, petitioner recited that the reason payments on account of the award of the Mixed Claims Commission were not included in gross income was because it believed that they were not to be included therein under section 112 (f) of the Revenue Act of 1928.

"13. Petitioner, after deducting * * * fees paid for obtaining the award and for obtaining payment on account of said award, applied the balance of the payments to the cost of the new steamers on its books. * * *"

To the decision of a majority of the Board that the gain realized by the taxpayer in 1928 was subject to taxation, one of its members filed a dissenting opinion.

John B. Sullivan, Jr., of Boston, Mass., for petitioner.

Frank J. Wideman, Asst. Atty. Gen. (Sewall Key and Lucius A. Buck, Sp. Assts. to Atty. Gen., of counsel), for respondent.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above).

The taxpayer kept its books on the accrual basis and properly entered for 1928 the amount awarded to it that year by the Mixed Claims Commission under the Settlement of War Claims Act of 1928 (45 Stat. 254). Automobile Ins. Co. v. Commissioner, 72 F.(2d) 265 (C. C. A. 2).

The questions before us are: (1) Whether the moneys amounting to the net sum of $312,157.60 paid to the taxpayer in August, 1928, were derived from property "involuntarily converted" in 1917 when the Wilmore was torpedoed; and (2) whether these moneys were forthwith in good faith expended in the acquisition of property similar to that converted.

■ The fact that a treaty between the United States and Germany and the enactment by Congress of the Settlement of War Claims Act were necessary to render the claim to recover for the loss of the Wilmore enforceable cannot affect the taxpayer's rights. While at one time it had little more than a hope of some recovery, in the end it realized a further gain when it collected $312,157.-60 upon its claim which arose in 1917. As was said by the Supreme Court in Williams v. Heard, 140 U. S. 529, 541, 11 S. Ct. 885, 888, 35 L. Ed. 550, when dealing with the rights growing out of the depredations of the Confederate cruiser Alabama during the Civil War and the act of Congress providing for payment: "There was * * * at all times a possibility that the government would see that they were paid. There was a possibility of their being at some time valuable. They were rights growing out of property; rights, it is true, that were not enforceable until after the passage of the act of congress for the distribution of the fund. But the act of congress did not create the rights. They had existed at all times since the losses occurred. They were created by reason of losses having been suffered. All that the act of congress did was to provide a remedy for the enforcement of the right."

See, to the same effect, Bachman v. Lawson, 109 U. S. 659, 3 S. Ct. 479, 27 L. Ed. 1067; Phelps v. McDonald, 99 U. S. 298, 25 L. Ed. 473; Erwin v. United States, 97 U. S. 392, 24 L. Ed. 1065; Comegys v. Vasse, 1 Pet. 193, 7 L. Ed. 108.

Accordingly the moneys paid to the taxpayer in compliance with the award were in no sense a gratuity, but were based on an obligation dependent for enforcement on negotiations with Germany which might or might not bear fruit. But whatever fruit they bore was derived from the obligation of the latter to make compensation for property it had converted.

■ It seems to us quite immaterial that the casualty was complete in 1917; whereas the conversion into money did not, to the extent of the award, occur until 1928. It is equally unimportant that the sum paid by the insurance companies in 1917 and the award fixed and in part paid in 1928 totaled more than the initial investment in the Wilmore, or that the gain realized in 1917 is for immediate tax accounting purposes to be treated as closing the transaction in that year. It was proper so to treat it, for the time being, when the chance of a further recovery was very remote and entirely speculative. United States v. S. S. White Dental Mfg. Co., 274 U. S. 398, 47 S. Ct. 598, 71 L. Ed. 1120. If there had been no insurance and the taxpayer had first succeeded in obtaining an award for the full value of the ship in 1928, it would hardly be maintained that the vessel was not "involuntarily converted * * * into money," within the meaning of section 112 (f), Revenue Act 1928, 26 USCA § 2112 (f). It surely can make no difference whether the moneys which represented the value of the ship were all derived from insurance, or all derived from an award, or were partly derived from one and partly from another, so long as they represented the value of the torpedoed vessel and were paid to recompense the owner for the loss of its property. The exemption given by the statute is out of the profit realized over cost. Any part of the profit not expended in the acquisition of similar property is taxable and any part so expended is exonerated. Consequently the length of time that elapsed after the casualty and the fact that the first sum paid for the loss was not expended in the acquisition of other property similar to that converted are irrelevant considerations. The taxpayer had the right to apply any part of its realizations in acquiring similar property and thus to exonerate that part from taxation, while otherwise using the balance, which would be subject to tax. We are clear that the moneys received from the award in August, 1928, were derived from property involuntarily converted in 1917 and were ex-

empt from taxation so far as they were actually expended in 1928 in the construction of new vessels.

The last, and as we think the only doubtful question, is whether the payments made under the award in August, 1928, were expended in the construction of the new ships. A majority of the Board were of the opinion that the record did not clearly identify the payments on the contract of June 30, 1928, with the amounts received under the award in August, 1928, and concluded that the recitals in the stipulation that the petitioner "intended to apply to such construction all sums to be received as payments on account of the award" and "applied the balance of the payments to the cost of the new steamers *on its books*" furnished insufficient proof of application of the moneys. While the matter is not free from difficulty, the treatment of the record by the Board seems unduly technical and the evidence of the application of the award toward the construction of the new colliers too strong to justify a finding to the contrary.

█ In the first place, it is rather significant that the Commissioner in his determination letter addressed to the taxpayer stated that the $312,156.60 "was credited to surplus on the books and treated as nontaxable income when filing your return for the reason that it was expended in replacing property destroyed." He then went on to disallow the exemption upon the erroneous theory that no "replacement fund" was established with respect to the moneys received in 1917. Thus he in effect found that the award paid in August, 1928, was expended in constructing the new colliers and denied exemption only because *the recovery in 1917* was not used in replacing the Wilmore or in establishing a fund for such a purpose. The statement of the Commissioner made after consideration of evidence presented by the taxpayer was of evidential value and prima facie correct. Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184.

█ In addition to this the stipulation between the parties shows that, when the taxpayer contracted for the new ships, it intended to apply all sums to be received on account of the award toward their construction, that the payments were to be made on the installment plan, and that up to December 31, 1928, the taxpayer paid out $484,652.67 toward the construction of these vessels though they were not contracted for until June 30, 1928. As the payments were to be by installments, it must be assumed that nothing was paid in advance. We, therefore, find this taxpayer receiving the award of $312,157.60 only six weeks after the new ships were ordered, paying out between June 30 and December 31, 1928, for construction some $172,000 more than it received under the award, and applying the $312,157.60 to cost of construction on its books. The entry itself seems to indicate that the award was applied as recorded, and it is most difficult to imagine why the making of such an entry should have been stipulated if it was not intended to lead to such an inference. It is also highly improbable that the taxpayer would set out to apply the award to the ships, would receive it during the progress of the work, and yet would fail to make the application.

In view of all these factors, the conclusion of the Board that proof of the application of the award to the construction of the new ships was lacking seems to us unreasonable. Our decision in Bandes v. Commissioner, 69 F.(2d) 812, is not contra. It went no farther than to hold that under section 112 (f) of the Revenue Act of 1928, a taxpayer could not claim an exemption for any profit realized in a condemnation proceeding if he used the profit merely to repay his own prior expenditures in purchasing similar property.

The order of the Board determining a deficiency was erroneous and is reversed.

CHASE, Circuit Judge (dissenting).

My inability to agree with my brothers upon a reversal of the decision of the Board of Tax Appeals relates only to the evidential force to be given the stipulation of the parties as to the use of the money received by the taxpayer under the award. I agree that it could have used it, or any part of it, forthwith upon its receipt to replace the Wilmore with similar property and be free from income taxation either as a whole or pro tanto regardless of the lapse of time between the destruction of the Wilmore and the receipt of the award. But the burden to show such use was upon the taxpayer. Its "proof" was ambiguous and failed to satisfy a majority of the Board that it did more than make book entries to apply such receipts as a credit against prior expenditures. That is not

enough to obtain the exemption under section 112 (f) of the Revenue Act 1928, 26 USCA § 2112 (f). Bandes v. Commissioner (C. C. A.) 69 F.(2d) 812. And we ought not to reverse on the facts where the record is so equivocal.

For this reason, I would affirm.