## WINTER REALTY & CONSTRUCTION CO. v. COMMISSIONER OF INTERNAL REVENUE.

## COMMISSIONER OF INTERNAL REVENUE v. WINTER REALTY & CONSTRUCTION CO.

No. 43.

Circuit Court of Appeals, Second Circuit.

May 7, 1945.

William Dwight Whitney and Cravath, Swaine & Moore, all of New York City (Roswell Magill, George G. Tyler, and William R. White, all of New York City, of counsel), for Winter Realty & Construction Co.

Hilbert P. Zarky, of Washington, D.C., Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Robert N. Anderson, Sp. Assts. to Atty. Gen., for the Commissioner.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Both parties appeal from an order of the Tax Court which assessed a deficiency against the taxpayer in its income tax for the years 1932, 1935 and 1936; and an additional deficiency in excess profits tax for the years 1935 and 1936. The question involves the proper construction of § 112(f) of the Revenue Acts of 1932, 1934 and 1936, 26 U.S.C.A.Int.Rev.Code, § 112(f). The first question is as to how much of an award granted to the taxpayer upon condemnation of certain real property was "expended in the acquisition of other property similar * * * to the property" condemned, "or in the establishment of a replacement fund." The second question is whether, when an award is paid in installments, spread over more than one year, a taxpayer is entitled to exemption as to all of any installment "expended" in any given year in acquiring "similar property," regardless of what he may have so expended in the past. The taxpayer owned real property in Flushing, New York, which the City condemned on November 4, 1931, and the "basis" of which was $136,564.83. The net amount of the award, paid in installments and after considerable litigation, was as follows: in 1932—$160,292.81; in 1935—$125,735.57; and in 1936—$101,116.25. The first of these sums the taxpayer deposited in its bank account when paid; an account on which it drew for its general needs, and in which it deposited its current receipts. Out of the first payment it invested $15,000 in 1932 in the pur-

chase of a mortgage on real estate, and $45,713.94 in buying "similar property." The Commissioner taxed as "gain" in 1932, the difference—$23,527.98—between the amount so received in that year, and the "basis." In 1935 the taxpayer invested the whole of the installment of that year in mortgages on real property; all of which the Commissioner taxed as "gain," because the "basis" had been fully restored by the first installment. In 1936 the taxpayer invested out of the award of that year, $50,000 in mortgages, and the balance —$51,116.25—in "similar property." The Commissioner assessed the whole payment of 1936 as "gain" because the total of all the sums invested in "similar property"— $45,713.94 plus $51,116.25—had not equalled the "basis"—$136,564.84.

In closing its books for the year 1932, the taxpayer set up on the liability side of its ledger an account, entitled "Replacement Fund," to which it credited the full amount of the award received in that year. In 1935 it added to this item upon its ledger the award received in that year; and so it did in 1936. In 1932 its vice president and manager, after reading the regulation regarding the establishment of replacement funds, quoted in the margin,[1] went to the office of the collector, procured the prescribed form in triplicate, filled it out and mailed it to the official in the Brooklyn office to whom he had been told to send it. Later, the taxpayer made several inquiries at the same office about this application, but could learn nothing; apparently, although received, it had been lost, and it never has been found. In making its return for the year 1932 on March 15, 1933, the taxpayer enclosed a letter calling attention to the fact that "there has been set up a figure headed 'replacement fund.' This figure represents sixty per cent of the City's appraisal * * * it is the intention * * * upon receipt of the balance of the award * * * to replace same in property in similar or related in service, or use of the property so converted." The Commissioner never took any action upon this letter. On February 3, 1937, the taxpayer filed a second application, upon the form prescribed for the purpose, for "permission" to "establish a replacement fund", but the Commissioner never acted upon this application either. The Tax Court held that the attempt to set up a "replacement fund" failed; that the mortgages were not "similar property or property related in service or use"; but it allowed the sum of $51,-116.25 invested in real estate in 1936 as an exemption because it had been invested in that year in "similar property or property related in service or use." This last ruling is the basis of the Commissioner's appeal; the taxpayer appeals from the rulings against it.

Everyone agrees as to the purpose of § 112(f); indeed, it would be impossible to mistake it. An owner, whose property is taken involuntarily, but who has become entitled to compensation, should not be treated as having "realized" a taxable "gain," provided he at once puts the proceeds to a similar use. Such an owner will often find himself in a difficult predicament in cases where the property is of a kind not easily replaced, and where he cannot therefore immediately purchase a

---

1 "Art. 580. *Replacement fund.* In any case where the taxpayer elects to replace or restore the converted property but it is not practicable to do so immediately, he may obtain permission to establish a replacement fund in his accounts in which part or all of the compensation so received shall be held, without deduction for the payment of any mortgage. In such a case the taxpayer should make application to the Commissioner on Form 1114 for permission to establish such a replacement fund, and in his application should recite all the facts relating to the transaction and declare that he will proceed as expeditiously as possible to replace or restore such property. The taxpayer will be required to furnish a bond with such surety as the Commissioner may require in an amount not in excess of double the estimated additional income taxes which would be payable if no replacement fund were established. (See section 1126 of the Revenue Act of 1926.) The estimated additional taxes, for the amount of which the claimant is required to furnish security, should be computed at the rates at which the claimant would have been obliged to pay, taking into consideration the remainder of his net income and resolving against him all matters in dispute affecting the amount of the tax. Only surety companies holding certificates of authority from the Secretary of the Treasury as acceptable sureties on Federal bonds will be approved as sureties. The application should be executed in triplicate, so that the Commissioner, the applicant, and the surety or depositary may each have a copy."

substitute. This the statute recognizes by providing that in such a case he may "establish" a "replacement fund," an option which is however subject to regulation by the Commissioner who in fact regulated it by Article 580 of Regulations 77, already quoted. By this he requires an owner who wishes to "establish" such a "fund" to get "permission" which he is to obtain by filing an application in which he declares that he will replace the property as soon as possible—the prescribed form requires a date to be fixed—and, when that has been approved, by posting a bond to secure the tax "which would be payable if no replacement fund were established." The form of the "fund" is not prescribed, and, arguendo, we may assume that entries upon the owner's books, such as the taxpayer here carried, if supported by bank deposits, or mortgages, would be permissible. For example, the regulation reads: "he may obtain permission to establish a replacement fund in his accounts in which * * * the compensation * * * shall be held." The taxpayer challenges the validity of this regulation, but it appears to us to be within the power conferred by the statute. The purpose of the privilege was to avoid forcing an owner to a hasty, perhaps an impossible, investment, but it did not give him an indefinite time. Even though his failure to find "similar property" were not due to any fault of his, there must come an end and at the end he would be taxed as though the property had been voluntarily "converted." We cannot see how the regulation could have realized this with greater freedom to the owner and yet with that minimum of security to the Treasury, which was certainly demanded; it allows the owner to keep his "fund" in whatever form he finds most convenient and profitable, and only demands of him adequate assurance of his good faith and eventual performance. We do not mean that another regulation might not have been equally lawful: the Commissioner might have secured the tax by a rigid control over the form of the "fund," or by requiring that he should consent to any withdrawals. But it was his function, not ours, to decide what was on the whole the most desirable method; and the form which he did choose has survived many recensions of the statute. We have no doubt that it is valid.

■ Since the taxpayer at bar did not get permission, it became entitled to the exemption only so far as it in fact "expended" the money in buying "similar property"; for the Commissioner's inaction, however negligent, was certainly not a performance of the condition, and the Commissioner could not be estopped. A taxpayer who has to deal with a sluggish and inert official is always in a trying position and has just ground for complaint; but that does not discharge him of whatever duties are lawfully imposed upon him as a condition of his privileges; and, indeed, in the case at bar the taxpayer itself was not a model of diligence and care. That the mortgages of themselves would not serve without the Commissioner's permission is plain; Congress meant to suspend the tax only when an owner, forced out of one investment, found an equivalent investment, and money lent on mortgage is not the equivalent of real property, either as to its management, as to the security which it affords, or as to the return obtained from it. We affirm the order upon the taxpayer's appeal.

■ Upon the Commissioner's appeal the question is whether the sum invested in 1936 in "similar property," shall be exempted from the taxable "gain" in that year; and that in turn depends upon the meaning of the concluding words of § 112(f), 26 U.S.C.A.Int.Rev.Acts, page 858: "If any part of the money is not so expended, the gain, if any, shall be recognized, but in an amount not in excess of the money which is not so expended." The taxpayer argues, and the Tax Court agreed, that since the sum mentioned was "expended" in buying "similar property," the "gain" which could be "recognized" must not be "in excess of" what was left of the installment of 1936—$50,000. The Commissioner replies that the exemption begins only after all those parts of the award which have been "expended" in the purchase of "similar property" have been marshaled against the "basis"; and it seems to us that this is an inescapable conclusion. Obviously, an owner who receives a single award, of which he "expends" a part in the purchase of "similar property," may not exempt any part of the "gain" by allocating against the "basis" that part which he does not so "expend," and against "gain" that which he does. To do so would defeat the whole purpose of the exemption, which, as we have said, was to exempt an owner from taxes upon increases in the value of his property which he is forced

to "realize" as "gains." It is a corollary that he must do what he can to restore his position to what it was originally; and, so far as he does not, he will be regarded as content with the "realization" of the increase. If an award be made in several installments paid in the same year, the result is the same. An owner who does not "expend" the first installment in the purchase of "similar property," but does so "expend" a later one, may not marshal the first against his "basis" and assert that he had "expended" all the "gain" in the purchase of "similar property."

The distinction taken by the Tax Court was that the installments spread over different taxable years must be separately computed, because the tax for each year stands alone. Hence, all money "expended" upon "similar property" in any year, if it be a "gain," is entitled to the exemption; and it makes no difference that in earlier years the owner has not "expended" upon "similar property" an amount equal to the "basis." We agree of course, that the tax for every year must be separately assessed; but that does not mean that in computing the tax, we may not look to what has happened in earlier years. For example, if the price of property is paid in successive yearly installments, the earlier installments are first taken to amortize the "basis," and it is only after that has been done, that any "gain" arises. § 111(d) and § 44(b) of 26 U.S.C.A.Int.Rev.Code. If the Tax Court is right, by a simple expedient an owner can exempt his "gains" up to the amount of the "basis," and yet avail himself of that amount of the award for any purpose he may wish. All he need do is to use as he wishes the first installment up to the amount of the "basis," and invest the later installments in "similar property." It seems to us to need no argument to prove that that extends the privilege beyond its purpose.

The practical difficulties in application which the taxpayer suggests, do not exist. We take as the example the situation which it puts in its reply brief: the condemnation of property whose "basis" was $35,000, for an award of $150,000, paid $50,000 in each of three years. How it asks shall the "gain" be taxed? Let us assume that no part of

the first installment is invested in "similar property," but that the whole of the second installment is so invested. The owner will be taxed in the first year upon his "gain"—$15,000—and in the second year upon $35,000. All the installment for that year is "gain", and must be taxed unless exempted; and it will not all be exempted, because out of the first installment an amount equal to the "basis" was not invested in "similar property." To allow the owner to invoke the exemption before that has been done, has, as we have shown, the effect of freeing the "gain" up to the amount of the "basis" from the condition which is the presupposition of the privilege. In the case just put, the extent to which the third installment shall be taxed will depend upon how far it is invested in "similar property"; the whole "basis" having been amortized for the purposes of exemption, no deduction will be necessary. We need hardly labor the improbability that Congress should have meant to make the exemption depend upon whether an award, payable in installments, happens to be spread over more than a single year.

It is quite true that in Wilmore S. S. Co. v. Commissioner of Internal Revenue, 78 F.2d 667, a majority of this court decided the opposite. The owner's steamer had been torpedoed in 1917; it recovered $1,750,000 of insurance money, which was about $400,000 above the "basis"; and upon the "gain" so "realized" it then paid the tax. The value of the steamer had been $2,400,000, and in 1928 the Mixed Claims Commission awarded an added $650,000, upon $312,157.20 of which the Commissioner taxed it as a "recognizable gain." The owner asserted that it had in 1928 "expended" this part of the award upon other vessels which were "similar property," and that § 112(f) protected it; but the Commissioner and a majority of the Board of Tax Appeals held that the "gain" was not exempt. In this court, however, although the Board had passed upon the point now at issue the brief of the Commissioner did not press it.[2] It is true that we spoke of the Commissioner's ruling as "erroneous" in disallowing the exemption because the owner had "established" no

---

[2] The only three points it contained were headed as follows:

"I. The money received under the award was not received directly from the casualty in 1917 as a matter of right but

came to the taxpayer as damages, which were collected by its Government and remitted to it.", "II. The casualty was complete and final in 1917 and there was no conversion of the ship into this fund in

"replacement fund," but we were making use of that ruling only as evidence that he had thought that the award of 1928 had been in fact "expended" upon the new vessels; one of the issues before us and that upon which we split. Although we cannot deny that the decision did embrace a ruling contrary to that which we are now making, we do not regard it as having the same force as though it had deliberately overruled an objection pressed upon us at the time.

Order affirmed upon the taxpayer's appeal.

Order reversed upon the Commissioner's appeal.

the tax year 1928.", "III. The money received from the award was not used in the manner specified by the statute and hence cannot be tax free thereunder."