LEON STRAUSS AND THEORA STRAUSS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 41549. Filed April 27, 1954.

*Bert W. Levit, Esq.*, for the petitioners.
*T. M. Mather, Esq.*, for the respondent.

#### OPINION.

RICE, *Judge:* This proceeding involves a deficiency in income tax for the year 1949 of $13,282.53. The issue to be determined is whether the gain resulting from the involuntary conversion of property is to be recognized where the petitioners, in anticipation of the award, acquired similar property with borrowed funds. Other adjustments made in the deficiency notice have not been contested, and will be taken into account under a Rule 50 computation.

All of the facts were stipulated, are so found, and are incorporated herein by this reference.

The petitioners were husband and wife, and residents of San Francisco, California, in 1949. Their return was filed with the collector of internal revenue for the first district of California.

For some 15 years prior to May 1949, the petitioners owned the real property and improvements at 555 Tenth Street, San Francisco, where they manufactured paper excelsior packing materials, and purchased and sold other shipping supplies of various kinds. The business was carried on under the name of "Allied Box & Excelsior Company."

Late in 1948 or early in 1949, petitioners were informed by representatives of the State of California that the State would probably require their property for highway purposes. The petitioners immediately began to search for suitable replacement property. Their business necessitated property of a reasonably large area, located in the same general neighborhood. They realized that such property would be difficult to find. Discussions with the State continued throughout the period from January to April relative to a price to be paid in lieu of formal condemnation proceedings. Petitioners had by that time been definitely advised that the State would need their Tenth Street property.

In early May 1949, petitioners located suitable replacement property at 2169 Folsom Street. This was the only suitable replacement that an extensive search disclosed. Prompt purchase of the property was necessary in order to insure its availability. However, the petitioners did not have sufficient funds on hand to pay the full purchase price in cash, as required by the sellers.

On May 6, 1949, petitioners discussed the proposed condemnation proceedings with the Bank of California and arranged for a $75,000 loan, to be used to pay the purchase price of the Folsom Street property. They agreed with the bank that such loan was to be repaid from the condemnation proceeds. On the same date, the proceeds of the loan were made available by the bank by its cashier's check in the amount of $75,000, payable to California Pacific Title Insurance Company, through whom the escrow transaction in connection with the purchase of the Folsom Street property was being handled. None of the proceeds of such loan were at any time under the control or in the possession of the petitioners, nor did any of such proceeds pass through any bank account of petitioners, even momentarily. The cashier's check was delivered to the payee title company on or about May 6, and was cashed by the payee on May 10. The proceeds were paid by the title company to the sellers of the Folsom Street property on May 11, on which date title passed to it as petitioner's nominee.

On July 8, 1949, petitioners entered into a "Right of Way Contract—State Highway" with the State of California for the sale of the Tenth Street property for $160,500, payable within 60 days after

the vesting of the title in the State. Between July and October 1949, petitioners continued to occupy the property as tenants of the State while they were putting the Folsom Street property in shape for occupancy.

On August 24, 1949, the petitioners received the full purchase price of $160,500 from the State, and immediately deposited such amount in a special account in the Bank of California. This special account was opened on that date for the exclusive purpose of a depository for such money. On the same day the petitioners drew a check on the special account, payable to the Bank of California, in the amount of $75,000 as repayment of the loan which had been made to effect the purchase of the Folsom Street property.

Between August 24, 1949, and April 14, 1950, various additional sums were withdrawn from the special account to pay for the cost of improvements to the Folsom Street property and for certain other expenses incident to the relocation of their plant. The balance of the amount remaining in the special account was withdrawn by petitioners, by checks made payable to themselves, and the account was closed on May 12, 1950. At no time was the special account or any funds therein used for the general business purposes of the petitioners.

In the course of negotiating for the loan from the Bank of California to purchase the replacement property, petitioners were advised by the bank officials with whom they dealt and also by their certified public accountant that the proceeds received from the State did not constitute recognizable gain except to the extent that such funds were not spent in connection with the purchase and improvement of the replacement property. Except for the sum of $48,823.70 which was not expended, the petitioners expended the proceeds received from the State, in good faith and in accordance with such advice.

On their income tax return for 1949, petitioners reported only the unexpended $48,823.70 balance of the proceeds from the sale as a gain. They argue that the remainder of the proceeds, including the $75,000 repaid to the Bank of California, was "expended in the acquisition of other property similar" to the property condemned within the meaning of section 112 (f)[1] of the Internal Revenue Code in effect

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(f) INVOLUNTARY CONVERSIONS.—If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund, no gain shall be recognized, but loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized to the extent of the money which is not so expended (regardless of whether such money is received in one or more taxable years and regardless of whether or not the money which is not so expended constitutes gain).

for the taxable year 1949, and, therefore, that no gain is recognized on that part of the proceeds so expended.

The respondent determined that petitioners realized gain in the amount of $98,939.80. He denies that the expenditure of the proceeds received from the State meets the requirements of section 112 (f) of the Code and regulations issued pursuant thereto.

Regulations 111, section 29.112 (f)-1, provides:

In order to avail himself of the benefits of section 112 (f) it is not sufficient for the taxpayer to show that subsequent to the receipt of money from a condemnation award he purchased other property similar or related in use. The taxpayer must trace the proceeds of the award into the payments for the property so purchased. It is not necessary that the proceeds be earmarked, but the taxpayer must be able to prove that the same were actually reinvested in such other property similar or related in use to the property converted. * * *.

Respondent argues that the $75,000 repaid to the Bank of California from the proceeds received from the State can be "traced" only to the borrowed funds, and not directly into the replacement property. In essence, his argument is that gain resulting from an involuntary conversion of property is to be recognized where the taxpayer, in anticipation of the award, acquires similar property with borrowed funds.

In support of his position respondent relies on I. T. 3827, 1946-2 C. B. 57. The Commissioner therein ruled that a taxpayer who replaced requisitioned property in anticipation of receiving an award, by construction of new facilities financed out of his own funds or borrowed funds, would not enjoy the benefits of section 112 (f). The ruling states, page 58: "In reaching this conclusion, it was determined that no distinction should be made between taxpayers using borrowed funds and taxpayers using their own funds." The Commissioner relied on *Twinboro Corporation* v. *Commissioner*, 149 F. 2d 574 (C. A. 2, 1945), certiorari denied 327 U. S. 754 (1945), as authority for such ruling. That case holds that where an owner of condemned property, in anticipation of the award, bought similar property with his own funds and recouped himself out of the award when received, he may not enjoy the nonrecognition of gain benefits provided by section 112 (f). That holding follows the court's earlier decision in *Bandes* v. *Commissioner*, 69 F. 2d 812 (C. A. 2, 1934), certiorari denied 293 U. S. 568 (1934), affirming *Mendol Bandes*, 28 B. T. A. 99 (1933). In both the *Twinboro* and *Bandes* cases, however, the court explicitly confined its decision to the question of anticipatory replacement by a taxpayer from his own funds and subsequent self-recoupment from the award proceeds. In *Twinboro Corporation* v. *Commissioner*, *supra*, page 574, it said:

we reserve decision in case an owner borrows money to pay for "similar property," and later uses the award to pay the debt. Possibly that may be an

instance where the award is "expended in the acquisition of other property similar * * * to the property so converted."

See also *Kennebec Box & Lumber Co.* v. *Commissioner*, 168 F. 2d 646 (C. A. 1, 1948).

We do not think Congress intended to exclude all types of anticipatory replacement of involuntarily converted property from the benefits of section 112 (f).

Respondent points to the enactment of Public Law 251, 82d Cong., Act of Oct. 31, 1951, c. 661, 65 Stat. 733, as evidence to the contrary. For taxable years beginning after December 31, 1950, Public Law 251 amended section 112 (f) by eliminating the tracing requirements altogether.[2] This amendment accomplished a two-fold purpose, as explained in the Ways and Means Committee Report:[3]

No relief is accorded under existing law where, before receipt of the proceeds for converted property, the taxpayer purchases replacement property. Relief is denied in these anticipatory replacement cases since the benefits of section 112 (f) are limited to those cases in which the proceeds from the converted property can be directly traced into the subsequently acquired property. A problem also

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(f) INVOLUNTARY CONVERSION.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\* \* \* \* \* \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2),) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph :

(A) Nonrecognition of Gain.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary may by regulations prescribe. For the purposes of this paragraph—

(i) no property or stock acquired before the disposition of the converted property shall be considered to have been acquired for the purpose of replacing such converted property unless held by the taxpayer on the date of such disposition ; and

(ii) the taxpayer shall be considered to have purchased property or stock only if,' but for the provisions of section 113 (a) (9), the unadjusted basis of such property or stock would be its cost within the meaning of section 113 (a).

(B) Period Within Which Property Must Be Replaced.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

(ii) subject to such terms and conditions as may be specified by the Secretary, at the close of such later date as the Secretary may designate upon application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary may by regulations prescribe.

[3] H. Rept. No. 798, 82d Cong., 1st Sess. (1951).

arises under the present law where the taxpayer uses a part of the proceeds from the converted property to pay off indebtedness on the converted property. * * *

The plain import of this language, as we read it, as well as the explanation of the bill by the chairman of the committee on the House floor [4] is that Congress intended to extend the benefits of section 112 (f) : (1) To instances such as *Mendol Bandes, supra*, and *Twinboro Corporation* v. *Commissioner, supra*, where a taxpayer bought replacement property out of his own funds prior to receiving the award and later recouped himself; and (2) to cases such as *Kennebec Box & Lumber Co.* v. *Commissioner, supra*, where a part of the award proceeds was used to pay off indebtedness on the converted property. The Committee's statement that relief is denied under existing law in the case of anticipatory replacement of converted property must be read in the light of the phrase which immediately follows that statement: "* * * since the benefits of section 112 (f) are limited to those cases in which the proceeds from the converted property can be directly traced into the subsequently acquired property." In our view, Congress simply recognized that in most anticipatory replacement cases relief was denied because of the difficulties of tracing the award money directly to the new replacement property. Generally, it is more difficult to trace conversion proceeds directly into the replacement property where other funds have already been spent to purchase such property, than it is to trace such proceeds into property purchased after their receipt.

In *Wilmore Steamship Co.*, 45 B. T. A. 225 (1941), however, we had occasion to consider whether repayment of loans used to pay for the construction of new colliers out of an award subsequently received for the destruction of a similar vessel was a sufficient tracing of the award money into similar replacement property to come within the nonrecognition of gain provisions of section 112 (f). We held that it was, reaffirming our similar holding in an earlier Memorandum Opinion. In the case before us here, the loan proceeds, with which petitioners purchased the Folsom Street property in anticipation of receiving payment for their requisitioned Tenth Street property, never passed into their hands. It passed directly to the title company, and then to the sellers. When the award money was later received, it was placed in a special account. Petitioners' first act, thereafter, was to draw $75,000 from that account to repay the bank. This series of transactions must be viewed together as a composite picture. So viewed, it is possible to trace with absolute accuracy the

---

[4] 97 Cong. Rec. 10, 348 (1951).

course of the $75,000 from the condemnation proceeds directly into the Folsom Street property.

We see no justification for imposing more exacting standards of tracing condemnation proceeds where the purchase of replacement property has been made in anticipation of their receipt than where the purchase is made afterwards. We have, for example, not recognized gain on award proceeds when a taxpayer invested the award received from seizure and sale of a manufacturing plant in securities, and later sold those securities to purchase another plant. *Paul Haberland*, 25 B. T. A. 1370 (1932). We are unable to draw any real distinction in that situation and the one before us here. In both instances, the award money or its equivalent, whether borrowed funds or securities, was always carefully segregated and used only for the purchase of replacement property.

In *Washington Railway & Electric Co.*, 40 B. T. A. 1249 (1939), we had before us the question of whether a public utility should be permitted to include, as a part of the total replacement cost of condemned property, the amount which it spent to purchase and construct some of the needed facilities prior to receipt of compensation for its condemned property. Condemnation had been authorized prior to its acquisition of the replacement property. Immediate acquisition of such property was necessitated in order for it to carry on its operations without interruption. The total amount spent to construct new facilities exceeded the compensation paid by the Government. We recognized the ameliorative intent inherent in section 112 (f), and permitted the amount spent prior to the receipt of compensation for the condemned property to be included in computing the total cost of the replacement property and held that no gain or loss was to be recognized on the involuntary conversion pursuant to that section. Cf. *Vim Securities Corporation*, 43 B. T. A. 759 (1941), affd. 130 F. 2d 106 (C. A. 2, 1942), certiorari denied 317 U. S. 686 (1942), wherein we said that even if the intercorporate transactions there had been illusory, which we found they were not, the expenditure of money for new property long prior to the payment of the condemnation award did not satisfy the statute.

The petitioners have met the requirements of section 112 (f), and are taxable only on the $48,823.70 which they did not spend in acquiring the Folsom Street property.

Reviewed by the Court.

*Decision will be entered under Rule 50.*