CAMERON MACHINE COMPANY, PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 39443.   Filed June 14, 1955.

*Albert Krassner, Esq.*, and *Harold Wisan, Esq.*, for the petitioner.
*Francis J. Butler, Esq.*, and *Richard G. Maloney, Esq.*, for the
respondent.

OPINION.

FISHER, *Judge:* All of the facts are stipulated and are incorporated
herein by reference.

Petitioner owned a plant in Brooklyn, New York, in which it manu-
factured winding machines and slitting machines used by the paper,
plastic, textile, and rubber industries.   It also manufactured parts for
such machines.   Petitioner's business was active and substantial.   Its
backlog of unfilled orders was $2,410,400 at the end of the year 1945,
$3,784,300 at the end of the year 1946, and $4,071,100 at the end of
the year 1947.

On August 24, 1945, the Board of Estimate of the City of New York authorized the taking of part of petitioner's land and buildings for a throughway known as the Brooklyn Queens Connecting Highway. By letter dated September 4, 1945, from the president of the Borough of Brooklyn, City of New York, petitioner was advised that the City of New York intended to take the property about the first of January 1946.

The land and buildings to be taken by the city constituted approximately 42 per cent of the area and floor space in which petitioner conducted its business operations. An interruption of operations conducted in the departments located in the area in question would have resulted in the interruption of petitioner's entire production, and would have necessitated a shutdown unless substitute facilities were available at the time of demolition. For this reason, by contract dated November 8, 1945, petitioner commenced immediate construction on its own property (on land which was part of the plant property but not included in the property being taken by the city) of substitute facilities.

Thereafter, on July 29, 1946, petitioner applied to Trust Company of North America for a special loan of $150,000 to finance the approximate cost of the new construction. Petitioner advised Trust Company of its reasons for starting construction before the proceeds of the award for the property could be expected, and informed the Trust Company that it then estimated the cost of replacement facilities at approximately $150,000. A special loan of $150,000 was arranged for this specific purpose on petitioner's express agreement to repay the loan from the proceeds of the award promptly after the receipt thereof by petitioner.

Pursuant to the loan arrangement, Trust Company advanced funds to petitioner as follows:

| | |
|---|---|
| July 29, 1946 | $75,000 |
| Aug. 26, 1946 | 25,000 |
| Sept. 9, 1946 | 50,000 |
| | $150,000 |

At all times material to the instant case, petitioner maintained 4 bank accounts; 3 with Trust Company, 1 of which was a regular operating account; and 1 regular operating account with the National City Bank of New York. The proceeds of the special loan were credited by Trust Company to petitioner's regular operating account with that institution. Thereafter petitioner transferred $90,000 from that account to its regular operating account with National City Bank as follows: $15,000 on September 9, 1946; $10,000 on September 23, 1946; $15,000 on October 28, 1946; and $50,000 on December 12, 1946.

While the special loan was outstanding, petitioner borrowed other funds from Trust Company for general business purposes. The proceeds of these loans were also credited to petitioner's regular operating account with Trust Company.

Petitioner paid to the contractor, under the contract for the construction of substitute facilities, the sum of $131,472.36 *prior* to its receipt of the award from the City of New York, as follows:

| | | | |
|---|---|---|---|
| August 1945 | $1,300.00 | November 1946 | $18,965.12 |
| November 1945 | 2,359.28 | December 1946 | 8,500.73 |
| December 1945 | 521.83 | January 1947 | 15,467.22 |
| January 1946 | 700.00 | February 1947 | 108.57 |
| February 1946 | 3,655.00 | March 1947 | 106.40 |
| March 1946 | 3,746.37 | April 1947 | 282.95 |
| April 1946 | 4,634.56 | May 1947 | 1,810.86 |
| May 1946 | 4,452.00 | June 1947 | 6,740.12 |
| June 1946 | 1,929.99 | August 1947 | 3,342.65 |
| August 1946 | 19,912.28 | October 1947 | 4,413.34 |
| September 1946 | 14,175.97 | | |
| October 1946 | 14,347.12 | | $131,472.36 |

Of these payments, petitioner expended a total of $23,299.03 prior to the date (July 29, 1946) on which the special loan was negotiated and the first funds advanced to petitioner thereunder. Thereafter, during the period August 1946 through October 1947, petitioner expended the additional amount of $108,173.33. All of the above payments to the contractor were made from petitioner's account with the National City Bank with the exception of the payments made during the months of August and September 1946, which were from the regular operating account with Trust Company, and those made during November and December 1946, portions of which were from each regular operating account.

On October 18, 1947, the City of New York acquired title to petitioner's land and building, and on December 17, 1947, petitioner received a check therefor in the amount of $176,016.42, including interest. This check was deposited in a special bank account with Trust Company entitled "Cameron Machine Company Replacement Fund." The expense of attorneys and experts for obtaining the award amounted to $11,610.77 and were charged to this account, leaving a net amount for replacement purposes of $164,405.65. This amount included interest in the amount of $1,016.42. The net principal amount of the award, therefore, exclusive of expenses and interest, was $163,389.23.

On February 27, 1948, a payment of $80,000 to the Trust Company in repayment of part of the $150,000 special loan was made from the replacement fund account. On April 1, 1948, the balance due on the loan, $70,000, was paid off. Of this $70,000 payment, $51,472.36 was from the Cameron Machine Company Replacement Fund account.

The total portion of the loan which was repaid out of the replacement fund account was therefore in the amount of $131,472.36, and was equal to the amounts paid up to that date to the contractor for the replacement facilities.

Subsequent to receipt of the award on December 17, 1947, during the period April 30, 1949, through December 1952, petitioner expended the additional amount of $27,698.63, for the substitute facilities. This sum was paid out of the replacement fund account from time to time during that period.

On its books of account, petitioner recorded the receipt of the proceeds of the award from the condemnation proceedings in an account entitled "Reserve for Replacement," and charged to this account only costs incurred in providing the substitute facilities.

The property involved had a basis to petitioner for tax purposes of $50,876.96, and the gain to petitioner from the involuntary conversion was $112,512.27. The issue in this proceeding is the extent, if any, to which gain should be accorded nonrecognition pursuant to section 112 (f) of the Internal Revenue Code of 1939, then in effect, which provides in part as follows:

> If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted * * * into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, * * * or in the establishment of a replacement fund, no gain shall be recognized, but loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized to the extent of the money which is not so expended * * *

Petitioner contends that no part of the gain should be recognized on the theory that, within the meaning of section 112 (f), the entire award was expended in the acquisition of replacement property. Respondent contends, on the other hand, that all of the gain should be recognized because a portion of the award (in an amount in excess of the gain) was not expended in the acquisition of replacement property as required by section 112 (f) and the regulations pertaining thereto.[1]

Upon the facts, we find it necessary to segregate our discussion into three separate categories.

---

[1] Regulations 111, section 29.112 (f)–1, then in effect, provided in part as follows:

If any part of the money received as a result of such an involuntary conversion is not expended in the manner provided in section 112 (f), the gain, if any, is recognized to the extent of the money which is not so expended. * * *

In order to avail himself of the benefits of section 112 (f) it is not sufficient for the taxpayer to show that subsequent to the receipt of money from a condemnation award he purchased other property similar or related in use. The taxpayer must trace the proceeds of the award into the payments for the property so purchased. It is not necessary that the proceeds be earmarked, but the taxpayer must be able to prove that the same were actually reinvested in such other property similar or related in use to the property converted. * * *

(1) Anticipatory expenditures.

The special loan was negotiated on July 29, 1946. The City of New York acquired title to the property in question on October 18, 1947, and the ultimate award was paid on December 17, 1947. Prior to the above dates (from August 1945 to June 1946, inclusive) petitioner made payments in the total amount of $23,299.03 to its contractor for the progressing construction of the intended substitute facilities. It is obvious that the payments under discussion could not have been literally paid out of either the special loan or the award itself. Petitioner contends that it was necessary to begin and carry on the construction work in advance of actual condemnation and award in order to carry on its operations without interruption, and to avoid at least a temporary shutdown of its entire plant. The respondent does not appear to question the practical need or desirability of anticipatory action, but urges that anticipatory expenditures in advance of condemnation and award are not entitled to nonrecognition of gain under section 112 (f). Petitioner contends that such payments are, under the circumstances, entitled to nonrecognition of gain upon the express authority of *Washington Railway & Electric Co.*, 40 B. T. A. 1249 (1939).

The circumstances involved in *Washington Railway & Electric Co.*, *supra*, are in many respects similar to those presented by the issue under discussion. It will be noted, however, that our Opinion in that case recognized that "the line may not always be an easy one to draw." See also *Leon Strauss*, 22 T. C. 140 (1954) ; acq. 1955–1 C. B. 6. For the reasons hereinafter set forth, we must hold for the respondent on this issue.

Subsequent to *Washington Railway & Electric Co.*, *supra*, an issue similar in principle was presented in *Twinboro Corporation* v. *Commissioner*, (C. A. 2, 1945) 149 F. 2d 574 (certiorari denied 327 U. S. 754), affirming a Memorandum Opinion of this Court. We think the precise language of the Court of Appeals is significant in relation to the issue before us. The court said (p. 574) :

This case presents only one point in addition to those which we discussed in *Winter Realty & Construction Co.* v. *Commissioner of Internal Revenue*, 2 Cir., 149 F. 2d 567, handed down herewith. It is this: Whether an owner whose property has been condemned may buy "similar property" in anticipatory replacement of the award, pay for it out of his own funds, recoup himself later out of the award when he gets it, and treat any "gain" as exempt under § 112 (f), 26 U. S. C. A. Int. Rev. Code, § 112 (f). The taxpayer seeks to distinguish this situation from that which was before us in *Bandes* v. *Commissioner*, 2 Cir., 69 F. 2d 812, because here the property condemned was a garage, and the "similar property" was also a "garage," bought "in anticipatory replacement" of the first. In *Washington Railway & Electric Co.* v. *Commissioner of Internal Revenue*, 40 B. T. A. 1249, the Board of Tax Appeals, upon a review by the full Board, disagreed with our interpretation; but sought to distinguish the facts so as to

sustain our decision. We may of course have been wrong and the Board right, but the attempted distinction is untenable. In *Bandes* v. *Commissioner, supra,* the taxpayers had bought one parcel of land on which they meant to put up an apartment; but before they could do so, it was condemned. They looked about for a substitute, and found two parcels on which they then proceeded to build apartments. The attempted distinction is apparently that, as they had not yet built the apartment when the first parcel was condemned, and, as they might change their minds, the new purchases could not have been made "in anticipatory replacement" of the old. On what basis this can be supported we do not understand; but, be that as it may, we had not the slightest intention of depending upon anything of the sort; we assumed that the two parcels were bought "in anticipatory replacement" of the first, and to rest our decision upon our understanding that that would not serve. We adhere to that interpretation, though, as before, we reserve decision in case an owner borrows money to pay for "similar property," and later uses the award to pay the debt. Possibly that may be an instance where the award is "expended in the acquisition of other property similar * * * to the property so converted." That was not this case, for here the taxpayer bought and paid for the property out of its own funds.

Subsequent to *Twinboro Corporation, supra,* section 112 (f) was amended by Public Law 251 (H. R. 3590), Eighty-second Congress (ch. 661, 1st Sess., 1951–2 C. B. 353). The change does not affect the instant case, being inapplicable to the taxable year before us. Nevertheless the House Ways and Means Committee Report on Public Law 251 (H. Rept. No. 798, 82d Cong., 1st Sess. (1951)) sheds significant light on the issue. The report includes the following under the heading "General Statement":

While section 112 (f) of the code now operates in the majority of cases to relieve taxpayers from the payment of a tax upon gain where property has been involuntarily converted, the requirements of this provision have operated to deny relief in some cases where your committee believes that relief should be granted. *No relief is accorded under existing law where, before receipt of the proceeds for the converted property, the taxpayer purchases replacement property. Relief is denied in these anticipatory replacement cases since the benefits of section 112 (f) are limited to those cases in which the proceeds from the converted property can be directly traced into the subsequently acquired property.* * * * [Emphasis supplied.]

The interpretation by the Congressional committee thus recognizes that the existing law (applicable to the year in question) is fully consistent with the views expressed in *Twinboro Corporation, supra,* and recommends that the law be changed to grant relief in this respect.

We have made a critical reexamination of the provisions of section 112 (f) in the light of the foregoing, and have concluded that upon the facts before us gain must be recognized to the extent of the payments totaling $23,299.03 made prior to July 29, 1946.

(2) Payments from borrowed funds.

Petitioner arranged with Trust Company for a special loan totaling $150,000 with the specific objective of applying the proceeds of the loan

to the cost of replacement facilities as requirements arose. Petitioner expressly agreed to repay the loan promptly from the proceeds of the award. The dates and amounts of the total loan of $150,000 were: July 29, 1946, $75,000; August 26, 1946, $25,000; September 9, 1946, $50,000. Prior to the receipt of the award, petitioner paid the contractor the total sum of $131,472.36. Of this amount, we have considered in (1), *supra*, payments made prior to the loan totaling $23,299.03. We now consider the difference of $108,173.33, paid during the continuance of the loan, but prior to the date of the award, the payments being listed above, by months, from August 1946 to October 1947, inclusive.

We held in *Leon Strauss, supra*, that where petitioner purchased replacement property with borrowed funds, prior to the actual award, and repaid the loan promptly upon receipt of the award and out of the proceeds thereof, the repayment of the loan was a sufficient tracing of the award money into the replacement property to meet the requirements of section 112 (f).

Respondent does not question that the money was borrowed or that the payments to the contractor during the period under discussion were made for replacement facilities. His position is that petitioner has failed to trace the proceeds of the loan into the payments for such facilities.

From the factual standpoint, the problem presents much greater difficulty than *Leon Strauss, supra*, where the tracing was clearly and unquestionably established. Although the facts presented in the instant case are disappointingly meager, we find that petitioner has met its burden, though barely so.

Petitioner has established that it borrowed the sum of $150,000 for the express purpose of purchasing replacement facilities, and with the express understanding that it would be repaid from the proceeds of the award. It is true that petitioner deposited the proceeds of the special loan in its regular operating account with Trust Company and later transferred a total of $90,000 from that account to its regular operating account with National City Bank in 4 payments over a period of about 3 months. It is also true that part of the payments to the contractor over the period of the loan were made out of one of the above accounts and the remainder out of the other. It is equally true, however, that the total month-end balances of the 2 accounts abovementioned, together with 2 additional accounts with Trust Company, always exceeded the amount of the loan less such amounts as had been paid previously to the contractor. The record discloses only month-end balances for the period in question. We recognize that the burden of proof is on petitioner, but we feel that we may reasonably infer that the total of balances in the 4 accounts at all times during

said period was in excess of the loan minus payments for replacement facilities, since respondent had access to the bank records and fails to suggest in the record or in his briefs a single date on which such circumstance did not apply.

In determining whether or not the facts establish a sufficient tracing to comply with the requirements of section 112 (f), it should be noted that the section in question has no provision prohibiting commingling of funds, or requiring that they be earmarked. The applicable regulations, *supra*, expressly provided that it "*is not necessary that the proceeds be earmarked*, but the taxpayer must be able to prove that the same were actually reinvested in such other property * * *." (Emphasis supplied.)

In the light of the foregoing, we think that petitioner's agreement with the bank at the time the loan was arranged, its retention of sufficient total balances in banks during the period in question as already described, and its repayment of the loan after receipt of the award, are a sufficient compliance with the provisions of section 112 (f). We find support for this view in *Wilmore S. S. Co.* v. *Commissioner*, (C. A. 2, 1935) 78 F. 2d 667, reversing 30 B. T. A. 866, in which the court said (p. 670):

> The last, and as we think the only doubtful question, is whether the payments made under the award in August, 1928, were expended in the construction of the new ships. A majority of the Board were of the opinion that the record did not clearly identify the payments on the contract of June 30, 1928, with the amounts received under the award in August, 1928, and concluded that the recitals in the stipulation that the petitioner "intended to apply to such construction all sums to be received as payments on account of the award" and "applied the balance of the payments to the cost of the new steamers *on its books*" furnished insufficient proof of application of the moneys. While the matter is not free from difficulty, * * * the evidence of the application of the award toward the construction of the new colliers [seems] too strong to justify a finding to the contrary.

Respondent further argues that since the award was paid on December 17, 1947, and the loan was paid off in 2 installments, $80,000 being paid on February 27, 1948, and $70,000 on April 1, 1948, the award money was not "forthwith" paid for the replacement facilities. Assuming *arguendo* that the word "forthwith," as used in section 112 (f), is intended to apply to the repayment of the loan, we think that it would amount to a hypertechnical construction of the section if we were to hold that its relief objective is to be defeated by so short a delay, especially since, in *Paul Haberland*, 25 B. T. A. 1370, we adopted, *inter alia*, in our construction of "forthwith," the following language: "within a reasonable time under the circumstances of the case."

We hold, in the light of the foregoing circumstances, that the non-recognition of gain provisions of section 112 (f) have been met with

respect to the amounts totaling $108,173.33 paid to the contractor during the period from August 1946 to October 1947, inclusive.

(3) Payments from the award.

After the award was received on December 17, 1947, a special account was established out of which the special loan to the extent of the construction costs up to the date of receipt of the award was repaid. Subsequent to that date, and through the month of December 1952, petitioner expended out of that account the additional sum of $27,-698.63 for substitute facilities. If we had held for respondent on both issues (1) and (2), the entire gain would have been recognized, and it would have been unnecessary to consider the amount of $27,698.63 referred to above. Since we held for the petitioner on issue (2), it is necessary, for completeness, to determine the treatment of the amount now under consideration.

In respondent's memorandum brief filed January 25, 1955, the following statement is made:

After the aforesaid payments of $131,472.36 were made from the special account the petitioner expended the total sum of $27,698.63 from such account for the replacement property. This latter amount appears to be the only amount actually traceable from the award into the replacement property. * * *

Respondent nowhere argues that the above payments fail to comply with the nonrecognition of gain provisions of section 112 (f), and we therefore hold, without further discussion, that the sum of $27,698.63 is not to be recognized as gain.

The net amount of the award is somewhat in excess of the total of the items considered in issues (1), (2), and (3) hereof. We assume that any adjustments required in relation thereto will be disposed of under Rule 50.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

KERN, *C. J.*, dissenting: In my opinion the case of *Washington Railway & Electric Co.*, 40 B. T. A. 1249, which was reviewed by the full Board, which was not appealed, and in which the Commissioner acquiesced (1940–1 C. B. 5), correctly states the law applicable to the first issue herein in spite of the assumption to the contrary made by those who drafted the Congressional report quoted in the majority opinion herein. I know of no valid reason why the rule in *Washington Railway & Electric Co.* should be confined in its application to situations in which the taxpayer is a public utility. Therefore, I respectfully note my dissent.

HARRON and OPPER, *JJ.*, agree with this dissent.