Lucile McAulay FILIPPINI, as Executrix of the Last Will and Testament of Carra McAulay, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 38438.

United States District Court
N. D. California, S. D.

Dec. 1, 1961.

Henry C. Clausen, Clausen & St. Clair, San Francisco, Cal., for plaintiff.

Cecil F. Poole, U. S. Atty., Richard L. Carico, Asst. U. S. Atty., San Francisco, Cal., for defendant.

SWEIGERT, District Judge.

Plaintiff, as executrix of the estate of one Carra McAuley, has brought this refund action against the United States for the recovery of $33,609.64, income taxes assessed and collected from the decedent prior to her death for the year 1953. This Court has jurisdiction under 28 U.S.C. § 1346(a) (1).

It appears from the complaint and the transcript of record that the decedent owned approximately 263 acres of improved realty, located in Stanislaus County, California, near the City of Patterson, which was held by her for investment purposes. The majority of this property, 251 acres, had been leased for farming purposes since 1943 and had been irrigated, leveled, and cultivated by

the tenants. (Tr. 61–66). The only buildings on this portion of the land were three pump houses. (Tr. 44).

The other portion of the land, 12 acres, was leased to a tenant who had erected and was operating a drive-in movie theatre. (Pl.'s Ex. 4; Tr. 48).

The United States commenced condemnation proceedings against this land, see United States v. 538.48 Acres of Land, Civil Action 6528 (N.S.Cal.N.D.). On or about February 17, 1953, after trial and judgment in favor of the decedent, the United States deposited the decedent's share of the award, $265,432.-90, with the Court, of which $10,432.90 represented interest. (Def.'s Ex. K, L & M; Pl.'s Ex. 1).

Upon receipt of the award, decedent purchased other property with part of the proceeds, six vacant lots in the City of Patterson, costing approximately $3,-000.00, upon which she erected an office building, costing her approximately $108,355.02. (Dep.'s Ex. E; Tr. 55–56). The office building was then rented to various individuals and business firms. (Tr. 21–22).

In determining her taxable income for 1953, the decedent treated the entire $265,432.90, received in satisfaction of the condemnation award, as sales price of the condemned property, from which she deducted attorneys' fees, costs and severance damages, and also the sum of $108,355.02, expended by her in constructing the office building on the new property.

This last deduction was taken by her under the theory that the latter property was a "replacement" of the income-producing property previously condemned. (Def.'s Ex. D.). The remainder was treated by her as income taxable at long term capital gain rates.

The District Director disapproved the decedent's return and proposed a deficiency based upon the following adjustments:

(1) $10,432.90 of the condemnation award was reclassified as interest taxable at ordinary income rates;

(2) the amount expended on the office building, $108,355.02, was recognized as income and added to the gain realized upon condemnation of the decedent's property, and;

(3) unreported interest from certain savings accounts was included as income. (Pl.'s Ex. 9; Pl.'s Complaint Ex. A).

Prior to the issuance of the statutory notice of deficiency, however, plaintiff herein consented to the additional assessments and collections, and paid them pursuant to notice and demand. (Def.'s Ex. P, Q, R and T; Pl.'s Ex. 10). Thereafter, on December 23, 1957, plaintiff filed a timely claim for refund alleging as her basis for recovery: (1) that the so-called interest portion of the condemnation award was properly reported as capital gain; (2) that the sum expended in construction of the office building was properly reinvested in income-producing property and was not recognizable as income; and, (3) that in any event the assessment of the deficiency was barred by the three year statute of limitations set forth in Section 275(a) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 275(a). (Pl.'s Ex. 9, Pl.'s Complaint, Ex. B).

Plaintiff instituted this action on August 11, 1959, more than six months after the filing of her refund claim with the Commissioner, as required by Sections 6532(c) and 7422 of the 1954 I.R. C., 26 U.S.C.A. §§ 6532(c), 7422. Subsequently, on August 27, 1959, the Commissioner denied the claim in full

I. Statute of Limitations

We will first consider plaintiff's contention that the statute of limitations had run prior to the assessment.

Section 275(a) of the 1939 I.R.C. provides that an assessment must be made within three years after the last date for filing the return. Under the facts of this case, the last date for filing the return would have been March 15, 1954, and any valid assessment would have had to have been made within three years, i. e., no later than March 15, 1957.

Plaintiff contends, however, that the assessment was made three days late, March 18, 1957, which is the date of the Form 17, "Statement of Income Tax Due," sent to the taxpayer by the defendant. (Def.'s Ex. 10). Plaintiff argues that as this form constitutes the notice of assessment, the date thereof is the date of the making of the assessment for purposes of the statute of limitations.

The statutes and regulations which establish the time and manner in which assessments are made (Sections 6202 and 6203 of the 1954 I.R.C., made applicable to the assessment of taxes under the 1939 I.R.C., by Section 7851(a) (6) (B) of the 1954 I.R.C., 26 U.S.C.A. § 7851(a) (6) (B); and Treas. Reg. Section 301.6203–1) provide, however, that an assessment shall be made by recording the liability of the taxpayer in the office of the Secretary of the Treasury or his delegate.

Under the regulations, a District Director is empowered to appoint one or more assessment officers, who shall make the assessment by signing a "summary record of assessment." The regulations further provide that the date of the assessment is the date the summary record is signed by an assessment officer. Treas. Reg. Section 301.6203–1.

There is nothing in the statute or the regulations to indicate that an assessment is incomplete until the sending of a notice of assessment to the taxpayer by means of Form 17, or otherwise.

█ Since the record in this case shows (Def.'s Exs. P, Q, R and S) that the assessment procedure outlined in the statute and regulations was followed and completed on March 15, 1957, the last day prior to the running of the statute, the assessment was timely and was not barred by Section 275 as plaintiff contends.

Plaintiff contends, however, that the assessment was invalid, because Form 17, the Statement of Income Tax Due, supra, was not sent by registered mail. There is no merit to this point.

█ Although the statute requires that the statutory notice of deficiency be sent by registered mail, see Section 272 (a), there is no such requirement as to the Form 17.

The section which requires that notice of an assessment and demand for tax (Form 17) shall be given a taxpayer, Section 6303(a) of the 1954 I.R.C. (made applicable to the 1939 I.R.C. by Section 7851(a) (6) (B) of the 1954 I.R.C.) allows such notice either to be left at the dwelling place of the taxpayer or his usual place of business, or to be mailed to him at his last known address. Such section does not, however, specify that the Form 17 be sent by registered mail, where notice is sent by mail, nor are we aware of any other section or any regulation which imposes such a mailing requirement.

Plaintiff next contends, as we understand the briefs, that the assessment is barred by the statute of limitations, because the "notice of deficiency assessment" was mailed on March 18, 1957, three days after the running of the statute.

As we have already pointed out, the "assessment" was made and complete on March 15, 1957, and that the Form 17 "notice of assessment," dated March 18th, is, therefore, irrelevant to the issue of limitations.

Plaintiff's assertion that no statutory notice of deficiency had been issued prior to the running of the statute is just not correct. A photostatic copy thereof, dated March 1, 1957, is attached to Plaintiff's Complaint, Exhibit A. It may be that plaintiff has confused this statutory notice of deficiency, dated March 1, 1957, with the "Statement of Income Tax Due," Form 17, dated March 18, 1957.

It is true that the statute of limitations would ordinarily be tolled for a ninety day period from the issuance of this statutory notice of deficiency, March 1, 1957, and that the Commissioner, by Section 272(a) (1), would ordinarily be prohibited from making an "assessment" during that ninety day period, and that

an assessment, whether considered as made on March 15th or March 18th would ordinarily be prohibited, and, therefore, invalid for that reason.

■ Such a restriction upon the Commissioner may, however, be waived, under Section 272(d), by a written consent between the Commissioner and the taxpayer. Plaintiff concedes that such a waiver was made in this case on November 8, 1956. (Def.'s Ex. G).

Plaintiff argues, however, that such a waiver made *prior* to the issuance of the statutory notice of deficiency, which here was issued on March 1, 1957, is invalid and is not effective to lift the restriction upon the Commissioner.

Although there have been cases so holding, See McCarthy Co. v. Commissioner, 80 F.2d 618, 621 (9 Cir. 1935), cert. den., 298 U.S. 655, 56 S.Ct. 675, 80 L.Ed. 1381, it is now settled that such a waiver, even if filed prior to the issuance of a statutory notice of deficiency, is effective. United States v. Price, 361 U.S. 304, 80 S.Ct. 326, 4 L.Ed.2d 334 (1950).

It follows that the restriction on the Commissioner, having been validly waived, the assessment made on March 15th was both timely and valid.

II. Interest

Plaintiff contends that the interest portion of the condemnation award was correctly reported as capital gain, and was not ordinary income as determined by the Commissioner. Plaintiff refers to the trial Court's award (Plt.'s Ex. 1), which included interest as part of the just compensation, and argues that, since the whole award was "compensation," that portion of it which included interest would be entitled to capital gain treatment.

■ A similar contention was rejected by the Supreme Court in Kieselbach v. Commissioner, 317 U.S. 399, 63 S.Ct. 303, 87 L.Ed. 358 (1943). There, a condemnation decree awarded as just compensation the value of the property on the day of the taking with interest there-on from that date to the date of payment. The Court held that the part of the award designated as "interest", although part of the "just compensation", was not a part of the sales price of a capital asset under Section 117(a) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev. Acts, and was taxable as income under Section 22 of that Code. We consider this case controlling with respect to the 1939 Code, applicable here. Cf. 320 E. 47th Street Corporation, 26 T.C. 545 (1956).

III. Replacement

The remaining question, involving the major portion of the recovery sought in this refund suit, is whether the money expended in the acquisition of the decedent's new property should be recognized as gain, under Section 112 of the Internal Revenue Code of 1939, 26 U.S. C.A. § 112.

Section 112(a) of the 1939 Code provides that upon sale or exchange of property the entire amount of gain shall be recognized, except, as is the case here, where there has been an involuntary conversion.

Section 112(f) provides with respect to this exception:

"If property (as a result of its * * * condemnation * * * is compulsorily or involuntarily converted—

"(3) Into money * * * and the disposition of the converted property * * * occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

"(A) If the taxpayer * * * purchases other property similar or related in service or use to the property so converted * * * at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion * * * exceeds the cost of such other property * * *."

The precise question for our determination is, then, whether the office building, acquired by the decedent taxpayer with a portion of the condemnation award, was "similar or related in service or use" to the farm and drive-in moving picture theatre taken by condemnation.

The Internal Revenue Service has taken the view that the statutory phrase, "similar or related in service or use," means that the property acquired must be "functionally" similar to the property converted, a test which involves a fairly strict comparison of the physical characteristics and uses of the original and replacement properties.

Accordingly, the Internal Revenue Service has ruled that there has been no replacement with property "similar or related in service or use" where an office building is replaced by a warehouse, Rev. Rul. 56–347, C.B. 1956–2, 517; where unimproved land is replaced by improved land, I.T. 1617, II–1, C.B. 119; where property leased to a tenant operating a business of parking and storing automobiles, including a service station, is replaced by a retail store building, Rev. Rul. 56–347, C.B. 1956–2; where a tug is replaced by a barge, L.O. 914, C.B. 1, 77. See, also, G.C.M. 14693, 135 XIV–1, C.B. 197.

By and large, the Tax Court has similarly applied this functional use test, and has held that there was no reinvestment in property "similar or related in service or use," where property used by tenants for offices, warehouse facilities, and storage rooms was replaced by property used by tenants as an automobile garage, service station, and automobile showroom. See, Steuart Bros., Inc., 29 T.C. 372 (1957), (reversed in Steuart Bros. v. Commissioner, 261 F.2d 580 (4th Cir. 1958) discussed infra); where a public parking lot was replaced by a warehouse, Thomas McCaffrey, Jr., 31 T.C. 505 (1958), (affirmed, McCaffrey v. Commissioner, 275 F.2d 27 (3rd Cir. 1960); cert. den. 363 U.S. 828, 80 S.Ct. 1598, 4 L.Ed.2d 1523 (1960) discussed infra); and where an office building was re-placed by several apartment houses, Liant Record, Inc., 36 T.C. 224 (1961).

In Lynchburg National Bank v. Commissioner, 208 F.2d 757 (4th Cir. 1953), the Fourth Circuit considered a case in which the original property, a three story building, owned by and adjacent to a bank, was rented out by the bank to tenants operating a retail shoe store and a restaurant. The replacement property, built on the same site after a fire, was a new structure used by the bank itself, as an addition to its banking premises.

Affirming a ruling of the Tax Court, the Court applied the functional use test, following a series of Tax Court cases, and stated that the test was not met by the substitution of a building used for banking purposes in place of a building used as a shoe store and a restaurant.

"To hold otherwise", said the Court, "would be to say that the replacement of one commercial building by another commercial building is sufficient under the statute to avoid the recognition of gain, no matter how dissimilar or unrelated their respective purposes may be * * *" (at 758–9).

In 1958, the same Court in Steuart Bros. v. Commissioner, 261 F.2d 580, 584 (4th Cir. 1958) considered a case in which the original property consisted of a real estate investment company's four and one-half acres of vacant, commercially zoned, urban realty, which was in part, committed to two one-story buildings—one to be leased to a retail grocery chain for use as offices, warehouse, and storage space, and the other to be leased to a real estate and trust company for use as a warehouse.

The replacement properties consisted of three separate parcels of urban commercial real estate. One such parcel, under lease at the time of purchase to an automobile dealer, later to a motor company, was improved with a one-story building used as automobile salesrooms, garage and service station with the remainder devoted to parking and used-car lot purposes. The second such parcel, under lease at the time of purchase

and continuously to an automobile dealer, was improved by two one-story buildings used as automobile showrooms, automobile repair shop, garage and service station, with the remainder devoted to parking and used-car lot purposes. The third such parcel, under lease at the time of purchase to an individual, later to the operator of a fleet of taxicabs, was improved by a two-story building used as a service station.

The Court reversed the ruling of the Tax Court that the properties were not "similar or related in service or use," stating that a comparison between the uses of the two properties would be relevant only if the taxpayer itself had used or intended to use the original land for the planned purposes and, if subsequent to the condemnation, the taxpayer had used the replacement property in the same manner as its tenants used it.

The Court distinguished the earlier Lynchburg case upon the ground that it involved a "user", rather than an "investor," and held that the taxpayer in Steuart, an investor, was entitled to the benefit of the statute because the replacement properties were for investment, as were the condemned properties, and that both the original and replacement properties were "of the same general class." [261 F.2d 584.]

The Court relied on two prior decisions of the Tax Court, M. J. Caldbeck, 36 B.T.A. 452 (1937), and Winter Realty & Construction Co., 2 T.C. 38 (1943).

In Caldbeck, a remodeled opera house, containing two ground floor stores and an upstairs moving picture theatre, was replaced by a new building to be leased as a department store. Although the case was decided against the taxpayer on the ground that the replacement had not been made "forthwith", as required by the Internal Revenue Act of 1932, the Tax Court, passing upon the comparative uses of the respective properties, held "beyond serious question" that the properties were "similar or related in service or use," pointing out that both were business properties and that the

statute did not require "exact" physical duplication.

In Winter, the original property consisted of a realty company's investment in five pieces of urban property, variously improved and rented—a brick warehouse, a concrete garage, a frame automobile accessory shop, a two-story frame residence, a barber shop, a frame nine apartment dwelling, a hardware store, cigar store, tailor shop, etc.

The replacement property consisted of a brick building with lower floor butcher, liquor, and barber shops, and upper floor chiropodist's office, employment office and Christian Science Reading Room; a building divided into four stores, a building used in part as a cafe, and other property committed to the construction of buildings.

The Tax Court had found that the properties were "similar or related in service or use," and this determination was accepted on appeal without discussion by the Second Circuit. Winter Realty & Construction Co. v. Commissioner, 149 F.2d 567 (2nd Cir. 1945).

Recently, the Third Circuit in McCaffrey v. Commissioner, 275 F.2d 27, 31 (3rd Cir. 1960) considered a case which involved replacement of a leased parking lot, 80' x 180', formerly used as a coal yard, in an industrial neighborhood, by a nine and one-third acre cinder-surfaced tract, industrially zoned, improved by a two-story building, 694' x 80', leased for warehouse purposes.

The Court upheld a Tax Court determination that the properties were *not* "similar or related in service or use." The taxpayer argued on the appeal that it was the "service or use" to which he put his money for the production of rental income in the two properties involved, rather than the "service or use" which the properties were designed to afford, which was decisive; and, further, that the two properties were in fact "similar or related in service or use," in that they were both "industrial properties."

The Court rejected the taxpayer's argument that the nonrecognition of gain

provisions of Section 112(f) were available to him simply because both properties were used by him for the production of rental income, and, further, rejected the contention that in the case before it the properties, one a parking lot and the other a warehouse, could both be reasonably classified as "industrial properties."

In making such a determination, the Court considered the opinion of the Fourth Circuit in Steuart, supra, characterizing the finding in that case, to the effect that converted real estate and its replacement were "of the same general class," as an ultimate finding of fact with which it was not concerned. But the Court, specifically rejected the view expressed in Steuart, that there was any basis in the statute for the application of different standards as between "users" and "investors" in determining whether replacement property is "similar or related in service or use," to the property converted.

We are of the opinion that any conflict between Steuart and McCaffrey is more apparent than real.

Notwithstanding some broad language contained therein, Steuart did not hold that the mere investment character of both the original and replacement properties satisfies the test of "similar or related in service or use." It went further to note and to hold that in addition the properties must be of "the same general class."

In reaching this conclusion the Court compared the characteristics of the investments there involved—both urban, rent-producing commercial properties and found that they were properties of the "same general class."

This indicates, at least, that the Court would not have regarded, for example, the replacement of commercial or industrial property with agricultural property as meeting the test merely because both were investment properties.

It is possible that the Court intended by its use of the term "same general class" to indicate that it would be sufficient if the investment properties were, cient if the investment properties were,

for example, both commercial or both industrial or both agricultural, etc., even though their physical characteristics and uses, within such broad respective categories, might be different.

It is apparent, however, that the determination whether property is commercial, agricultural or industrial, as the case may be, necessarily involves a consideration of the characteristics and uses of the property and the Court in Steuart indicated as much when it noted that the replacement property need not be an "exact" duplication of the converted property.

Viewed in this light, the Court's ultimate finding in Steuart that the properties there involved were of the "same general class" was a determination independent and separate from its further statement that different rules of law apply in the case of investment properties, as distinguished from properties used by the taxpayer. This distinction, in our opinion, was unnecessary to the Court's holding and should therefore, be treated as dicta.

We believe that in Steuart the Court may have had in mind, not a rule of law, but reference to a factor for consideration, i. e., whether both properties are generically comparable, e. g., commercial, industrial, agricultural, etc., which should be taken into account in determining the ultimate question of fact, i. e., whether the properties are "similar or related in service or use."

But, as we have just noted, such a determination necessarily involves consideration of the characteristics and uses of the properties. It may be that the Court had in mind that similarity of use and characteristics is not as significant in the case of replacement of investment properties as in the case of the replacement of property in use by the owner.

Obviously, when property has been held for investment and used by tenants a duplication of the same tenants, or even of the same business use, in a replacement property, is rarely possible. The investing owner must generally take

his tenants in the replacement property as best he can find them.

On the other hand, when an original property has been actually used by the owner, a continuity of that same use in a replacement property is highly probable and generally the case.

These are, therefore, factors for consideration by the Court in making its ultimate determination of "similar or related in service or use."

To hold, however, as a matter of law, that the Court is precluded from considering differences of characteristics and uses in the case of investment properties, is neither necessary, nor in our opinion, advisable.

The Court should have ample power to reach fair conclusions, concerning what is "similar or related in service or use" in the light of the clear purpose of the statute to provide a relief measure in favor of those whose continuity of use or investment has involuntarily been disrupted on account of the sovereign's necessity.

It would not, however, be within the purview of the statute to countenance transactions by the taxpayer which are designed to take advantage of the condemnation of their property by departing from, rather than substantially continuing, the original use or investment, as where, for example, the continued use or investment is manifestly unrelated in service or use to the former use or investment. An element of good faith of the action and purpose of the taxpayer is an inherent element of the legislative scheme.

Further, if it were the rule that a comparison of the characteristics and uses of the properties involved are not relevant with respect to an investor, unfair discrimination would result against the taxpayer whose personal use of his original property was disrupted by condemnation. Such a taxpayer, in order to avail himself of the statute, would be required to adhere closely to his original property in characteristics and use, e. g., a small garage for a small garage, a parking lot for a parking lot, etc., while an investment owner would gain the advantage of the statute's benefit, despite significant departure from his previous practice.

In McCaffrey, the Court, rejecting what we consider to have been dicta in Steuart, considered whether the two properties before it were both industrial properties, and held that they were not— a holding which we believe to have been proper on the facts before the Court, i. e., a small investment property used not industrially, but as a parking lot, and its replacement—an expansive, industrial investment property improved with a large warehouse.

It is not clear whether, if both properties had been found to have been used for industrial purposes, the Court would have held them, on that score alone, to be "similar or related in service or use," within the meaning of the statutory phrase. There is nothing to indicate that the Court would not have so held upon the theory that further differences in characteristics and use are less significant in the case of investment properties than in the case of replacement of property used by the owners.

Turning now to a consideration of the properties involved in this case, we note that the original property was a single parcel of rural property, approximately 263 acres in size, the major portion of which, 251 acres was farm land devoted to an agricultural use. The remaining 12 acres were used by a tenant for the commercial purpose of operating a drive-in movie theatre. The replacement property consisted of a single commercial office building, erected upon six city lots.

Giving consideration to all of the factors, we reach the conclusion that these are not even properties of the "same general class," as that term may have been used in Steuart and that they are not similar or related in service or use, rejecting plaintiff's contention that recognition of gain should be afforded her merely because both properties were held for the production of rental income

notwithstanding their significant dissimilarity, not only in characteristics and use, but even in general class.

In view of plaintiff's contention in this case and the apparent conflict between the Circuits, one of which, the Fourth Circuit, Steuart is relied upon by plaintiff, we have inquired into the legislative history of Section 112(f), in an attempt to discover the original and continuing legislative purpose. From our examination, however, which we have summarized and appended to this opinion, we conclude that there exists no legislative history which furnishes any support for plaintiff's contention.

We particularly note a proposal, substantially the same as the contention which plaintiff here makes, presented by the National Association of Real Estate Boards at hearings before the House Ways and Means Committee, with respect to the Internal Revenue Act of 1924, but no discussion or action by the Congress appears. (See Appendix).

Subsequent Congressional history, the Senate Finance Committee Report on the 1951 amendments, indicates the view of one committee that non-recognition of gain should be allowed in cases of the replacement of condemned property where at least both properties are devoted to a similar general use, such as farming, (see, appendix), but, no committee has indicated support for plaintiff's contention here.

The only Congressional indication of an intent to provide a rule broad enough to encompass the type of replacement involved in this case, is contained in the S.Rept. 1983, 85th Congress, 1958, quoted in the appendix. There, the Senate Finance Committee indicated its displeasure with what it described as the narrow interpretation given to "present law", i. e., the law prior to 1958, by the Internal Revenue Service and by the Courts. The Committee gave as an example of narrow construction, an exchange of a farm or a ranch for city real estate, essentially the situation here.

It may be that the Internal Revenue Service and some Courts have placed undue emphasis, in a manner already discussed herein, upon physical characteristics and uses in cases involving investment properties. At least, the Congress so regarded the matter as to make a basic change in the statute. It proposed an amendment, subsequently enacted as a new subsection (g) to Section 1033 of the 1954 Code, successor section of Section 112(E), providing that, if real property held for productive use in trade or business or for investment is, as a result of condemnation, involuntarily converted, property of a "like kind" to be held either for productive use in trade or business or for investment shall be treated as property "similar or related in service or use" to the property so converted.

█ Under such "like kind" test, it appears that the replacement of one investment property for another investment property, without regard to any dissimilarity of characteristics or uses, would be allowable. Cf. Alabama By-Products Corporation v. Patterson, 258 F.2d 892 (5th Cir. 1958), citing earlier cases to the effect that "like kind" is a broad phrase contemplating the distinction between classes of property (e. g., personal and real) no matter how dissimilar they may be in location, in attributes and in capacities for profitable use.

This legislative change, incorporating the broader and more liberal interpretation of the "like kind" test into present Section 1033, does not benefit this taxpayer, however, because the amendment expressly made the new subsection (g) applicable only to the involuntary conversions of real estate, occurring *after* December 31, 1957. Since the involuntary conversion with which we are here concerned occurred prior to this date, the new subsection is not applicable to the pending case.

Having determined that there exists neither case authority, nor legislative history, to support plaintiff's contention

in this case, and having determined as a fact that the two properties here involved are *not* of the same general class, and, further, their dissimilarity as to size, location, general character, use, etc., we, therefore, conclude that the replacement property was *not* property "similar or related in service or use" to the original property within the meaning of the applicable law.

Defendant, as prevailing party herein, will prepare findings of fact and conclusions of law in conformity with this opinion, and pursuant to the Rules of this Court, rule 52, 28 U.S.C.A.

## Appendix

The first such relief provision was enacted by Congress and incorporated into the Internal Revenue Act of 1921 as Sections 214(a) (12) and 234(a) (14), providing that, if the proceeds from the conversion were expended in the acquisition of other property *"of a character similar or related in service or use to the property so converted,"* (emphasis ours) there should be allowed as a deduction such portion of the gain as the proceeds so expended bore to the entire proceeds.

The Report of the House Ways and Means Committee, 67th. Cong., 1st. Sess., H. Rept. 350, p. 12, and the Report of the Senate Finance Committee, 67th. Cong. 1st. Sess., S. Rept. 275, p. 15, are to the same effect that the new section was intended to deal with cases where property has been involuntarily converted into cash as a result of condemnation, *inter alia,* when a taxpayer in good faith invests the money *"in the acquisition of similar property."* (emphasis ours).

These reports express a legislative concern that the "charcater" of the replacement and original properties be "similar" but do not define the term "similarity". Nor do the expressions of opinion by members of the House of Representatives, made upon the floor of that chamber, indicate any definite understanding of the precise meaning and exact scope of the section. See, the statements of Messrs. Hawley and Green, Cong. Rec. Vol. 61, 67th Cong. 1st. Sess., p. 5201, p. 5294.

In the Revenue Act of 1924, Section 203(b) (5), 26 U.S.C.A. Int.Rev.Acts, the language was changed to provide for tax relief by way of non-recognition of gain rather than by way of deduction. At the same time, the words *"of a character"* were eliminated, stating the test in its present form: *"similar or related in service or use."* (emphasis ours).

This latter change was not mentioned in the various Committee reports on the 1924 Act, and it may, therefore, be assumed that the change was regarded as technical and not intended to work any substantive difference. See, 68th. Cong., 1st. Sess., H. Rept. 179, pp. 13–14; S. Rept. 398, p. 6.

The hearings before the House Ways and Means Committee on the Revenue Act of 1924 include, page 518, a "Brief of the National Association of Real Estate Boards Proposing Certain Modifications of the Pending Revenue Act," which advanced a proposed amendment to the statute.

It was suggested, *inter alia,* that Section 203(b) (5) be changed to provide that the owner of real property *of any kind* which is involuntarily converted may reinvest the proceeds in other real estate *of any kind* without becoming liable to the tax. No action or discussion by the Committee appears to have taken place.

The Internal Revenue Act of 1926 carried forward Section 203(b) (5), intact, as did the Internal Revenue Act of 1928, 26 U.S.C.A. Int.Rev.Acts, though the latter act carried the language into a new section, Section 112(f), which has remained through successive re-enactments, 1932, 1934, 1936, 1938 and 1939, 26 U.S.C.A. § 112(f), without significant legislative history. See, Seidman, Legislative History of Federal Income Tax Laws, 1938–1861, 1115 (1938).

Certain changes were made by the Revenue Acts of 1942 and 1951, See 77th. Cong., 2d. Sess., H. Rept. 2333, p. 97; S. Rept. 1631, p. 121, as well as a

modification of the form of these provisions in 1951, Publ.L. 251, 82nd. Cong., 1st. Sess., but none of these changes affected the statutory phrase "similar or related in service or use." 3 Mertens, Law of Federal Income Taxation, Section 20.168, p. 637.

The Senate Finance Committee, which reported on the 1951 amendments provided interesting commentary upon the Section, 82nd Cong., 1st. Sess., S.Rept. 1052, p. 2, indicating its understanding that the replacement of farm land with farm land would comply with the statute, even though the original farm land was used for growing crops, and the replacement farm land was used for such dissimilar purposes as raising livestock, or growing fruit.

The next Congress, enacting the present Code in 1954, failed to provide any pertinent legislative history. 3 U.S. Code Cong. & Adm. News (1954), pp. 4410, 5070.

Lastly, in 1958, the Senate Finance Committee, S.Rept. 1983, considering H.R. 8381, calling for amendment of the 1954 Code "to correct unintended benefits and hardships and to make technical amendments", commented significantly and at length on Section 1033, indicating its displeasure with the relatively narrow construction which the Internal Revenue Service and the Courts had given to the phrase "similar or related in service or use":

The Committee noted:

" * * * Present law also provides (sec. 1031) for the nonrecognition of gain where property held for productive use in trade or business or for investment (not including inventory, stock, bonds, or other securities) is exchanged for property of a 'like kind to be held either for productive use in trade or business or for investment.'

"The phrase 'like kind to be held either for productive use in trade or business or for investment' has been given a broader interpretation than the similar or related phrase. 'Like kind,' for example, has been held to include unimproved real estate which is exchanged for improved real estate, so long as both properties are held either for productive use in trade or business or for investment. *Thus, the 'like kind' phrase has been held to include the exchange of city real estate (used in a trade or business) for a farm or ranch.* (emphasis ours).

"Both in the case of property involuntarily converted and in the case of the exchange of property held for productive use in trade or business or for investment, gain is not recognized because of the continuity of the investment. Your committee sees no reason why substantially similar rules should not be followed in determining what constitutes a continuity of investment in these two types of situations where * * * it appears particularly unfortunate that *present law requires* (emphasis added) a closer identity of the destroyed and converted property where the exchange is beyond the control of the taxpayer than that which is applied in the case of the voluntary exchange of business property. * * * " 3 U.S.Code Cong. & Adm.News, 85th Cong., 2nd. Sess. (1958), p. 4861.

As a result, the Committee added a new subsection (g) to Section 1033, providing that, if real property held for productive use in trade or business or for investment is, as a result of condemnation, involuntarily converted, property of a "like kind" to be held either for productive use in trade or business or for investment shall be treated as property "similar or related in service or use" to the property so converted. Such new subsection was, however, expressly made applicable only to the involuntary conversion of real property occurring *after* December 31, 1957.