**LOCO REALTY COMPANY, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

No. 16867.

United States Court of Appeals
Eighth Circuit.

Aug. 1, 1962.

Urban C. Bergbauer, Jr., St. Louis, Mo., for petitioner.

Harry Marselli, Atty., Tax Div., Dept. of Justice, Washington, D. C., for respondent and Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., Lee A. Jackson and Harold M. Seidel, Attys., Dept. of Justice, Washington, D. C., on the brief.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and HENLEY, District Judge.

BLACKMUN, Circuit Judge.

This corporate taxpayer appeals from a decision of the Tax Court, 35 T.C. 1059, sustaining the Commissioner's determination of an income tax deficiency for the calendar year 1955.

The deficiency was occasioned by the Commissioner's inclusion in the taxpayer's gross income of gain realized upon the condemnation of a building owned by the taxpayer at 17th and Pine Streets in the City of St. Louis. This gain was described in the taxpayer's 1955 return but it was there claimed that the gain was "unrecognized" inasmuch as it was "used in the purchase of building of same nature".

The governing statute is § 1033(a) (3) (A) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1033(a) (3) (A).[1] Two questions are presented:

    1. When did this taxpayer acquire the replacement property?
    2. At the time of that acquisition was the replacement property, as the statute requires, "similar or related in service or use to the property" condemned?

The Tax Court determined that November 8, 1955, was the date of acquisition. It answered the second question in the negative. We reverse on the latter issue and remand.

The basic facts are in part stipulated and are not in controversy. The taxpayer, incorporated in 1932, was in the business "of owning buildings for investment purposes". Except for a small royalty, its 1955 income, as shown in its return for that year, consisted only of rents. This rental income flowed from the Pine Street building, from its replacement property, and from a third building.

The Pine Street building was acquired by the taxpayer in 1939. It was then seven years old and had two stories, a service basement, and about 28,500 square feet of floor space. It received power, light, and gas. It had a freight elevator and a small office space on each floor. There were store fronts on the first floor. It was condemned by a duly constituted governmental authority. The award was paid to the taxpayer on June 8, 1955. At the time of condemnation the property was leased to a tenant which manufactured shoes. This tenant in turn subleased the first floor to another company engaged in combining leather for shoes.

The replacement property was on Forest Park Avenue in St. Louis. On May 1, 1955, it stood improved with two old adjoining factory buildings having partial second floors and a total area of about 60,000 square feet. The buildings had an open areaway between them. The first floors were obstructed by supported columns. There was a large concrete vault on the premises. A tool and die room was in the middle of one of the buildings.

The Pine Street property was located in the area described in the St. Louis zoning ordinance as the Central Business District. The ordinance permitted premises in that district to be used for any purpose other than a number of named activities. The replacement property was in the area described in the ordinance as the Industrial District. The use restrictions for property in the Industrial District were identical with those for property in the Central Business District.

About May 1, 1955, the Forest Park property was conveyed to David Bur-

---

1. The section reads: "If property (as a result of its * * * condemnation * * *) is compulsorily or involuntarily converted * * * into money * * *, the gain (if any) shall be recognized except * * * if the taxpayer * * *, for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, * * * at the election of the taxpayer the gain shall be recognized only to the extent that * * *".

deau, a shareholder and director of the taxpayer. The purchase price was $84,-000. Payment was effected by David's giving the grantor a $59,000 first deed of trust and $22,500 in cash borrowed from a bank. (The record is silent as to the remaining $2,500). The bank loan was made against a note of Burdeau Real Estate Company. This company, as did the taxpayer, held property for rental purposes. Its officers and shareholders and those of the taxpayer were the same. David, accordingly, was one of its shareholders. His brother, John G. Burdeau, was president of both companies.

The Stocker-Hausmann Company was engaged in the wholesale grocery business. On June 23, 1955, David, as lessor, and Stocker Hausmann, as lessee, executed a lease of the Forest Park property for a 15 year term beginning October 1, 1955. The property in its then condition, however, was not suitable for the lessee's operations. David therefore signed, and the lessee accepted, a letter, incorporated in the lease, whereby David agreed to make extensive alterations in the premises. The lease itself recited that the property leased was a "one-story building (after remodelling)" and that it was to be used and occupied "as Office and Warehouse for wholesale grocery business and for no other purpose whatsoever". The instrument called for a base rental and an additional sum, both payable monthly, "to amortize the cost of remodelling the demised premises". The lessor agreed to remove the second floor and to effect the alterations outlined in the letter-agreement.

In July Burdeau Real Estate Company arranged for the remodeling of the Forest Park property and acted on behalf of the taxpayer in so doing. The contractor submitted its bills on various dates from September 1955 to January 1956. These were paid by the taxpayer. The taxpayer, at the end of 1955, also paid for the installation of a sprinkler system on the property. After the alterations, the Forest Park property, with the second floor and supporting columns removed, had about 38,000 square feet of floor space.

By a warranty deed dated November 8, 1955, which recited consideration of "One Hundred Dollars and other valuable considerations" but bore no revenue stamps, David Burdeau conveyed the Forest Park property to the taxpayer. The taxpayer acquired it for rental and investment purposes.

It is the Tax Court's finding that the taxpayer acquired the Forest Park property only on November 8, 1955, and its finding and conclusion that that replacement property was not "similar or related in service or use", within the scope of § 1033(a), which are under attack by the taxpayer on this appeal. The Commissioner does not contend that the condemnation award was not invested by the taxpayer in the Forest Park property.

It is settled, of course, that decisions of the Tax Court are reviewed "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury". § 7482(a) of the 1954 Code. Accordingly, the court's findings of fact are not to be set aside unless clearly erroneous. Rule 52 (a), F.R.Civ.P. 28 U.S.C.A.; Commissioner v. Duberstein, 1960, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218; Sachs v. Commissioner, 8 Cir., 1960, 277 F.2d 879, 881, cert. den. 364 U.S. 833, 81 S.Ct. 63, 5 L.Ed.2d 59; Schoenberg v. Commissioner, 8 Cir., 1962, 302 F.2d 416, 419.

*The issue as to the date of acquisition.* The taxpayer contends that David's acquisition of the Forest Park property in May 1955 was on behalf of the taxpayer. If so, this was important, for the Tax Court stated flatly, p. 1063 of 35 T.C., "If we were able to hold that on May 1, 1955, David Burdeau took title as a strawman for petitioner as the beneficial owner of the Forest Park property, we might be able to hold that at that time the two properties were similar or related in service or use". The court

felt, however, that such a finding was not possible and that the weight of the evidence was to the effect that David's May 1955 acquisition was not for the taxpayer but was for Burdeau Real Estate Company.

We appreciate the taxpayer's argument that David was a director and officer of the taxpayer and could be said to have occupied a fiduciary relationship to it; that both he and John testified that David was acting for the taxpayer; that, in spite of the deed's recital, his conveyance to the taxpayer was without consideration; that the court did find that Burdeau Real Estate Company was acting on behalf of the taxpayer in contracting for the alterations; that it must follow that the taxpayer became the beneficial owner of the property at least by July when the alterations arrangements were made; that the taxpayer certainly would not have agreed to commit itself so substantially to alter the building unless it had actual or beneficial ownership; that it was the taxpayer which paid for the alterations; that it was not David who negotiated the lease; and that the taxpayer was the beneficial owner as of the date of the lease or as of the date of the contract for the alterations, both of which dates preceded the renovation of the property.

Wholly aside from what we might have found, had this court been the trier of fact, we cannot say that the Tax Court's finding that the taxpayer acquired the Forest Park property only on November 8, 1955, was clearly erroneous. David's posture with respect to Burdeau Real Estate Company was no different than his posture with respect to the taxpayer. He conceded on cross-examination that when he acquired the property he did not know to which of the two companies the property was going. Although John testified that the taxpayer assumed and paid the note to the bank, he also stated that Burdeau Real Estate Company paid that

obligation and took a deed of trust from the taxpayer. This evidence and the inferences which flow from it provide a proper basis for the Tax Court's finding as to the date of acquisition. This issue, therefore, must be decided against the taxpayer.

*The issue as to similarity or relationship in service or use.* Here the Commissioner emphasizes that the use of the Pine Street building was for light manufacturing; that the use of the Forest Park building was very different because the lease restricted its use to that of an office and warehouse for the wholesale grocery business; that the alterations were necessary because the building was not suitable for warehouse purposes; and that, in contrast to Pine Street, Forest Park, after alterations, had little natural light and ventilation, was provided with loading platforms and truck parking space, and was serviced with electricity only for lighting and not for power.

The taxpayer emphasizes that all that was done was the replacement of one investment property with another investment property of like kind; that this, and not functional use, is the proper test under § 1033(a); that, in any event, both properties were rental properties, both were industrial, and both could be used for manufacturing; and that the demands of the statute were met.

The provisions of § 1033(a) relating to involuntary conversions of property and, indeed, the very words, "similar or related in service or use", first appeared (although made applicable to prior years) in § 214(a) (12), concerning individuals, and in § 234(a) (14), concerning corporations, of the Revenue Act of 1921. The same language has been present in each succeeding Revenue Act and in the 1939 Code.[2] Similarly, § 202(c) (1) of the 1921 Act and the corresponding section of each Revenue Act and

---

2. § 203(b) (5) of the Revenue Acts of 1924 and 1926; § 112(f) of the Revenue Acts of 1928, 1932, 1934, 1936 and 1938; § 112(f) (1) of the 1939 Code, 26 U.S. C.A. § 112(f) (1).

Code since then[3] has contained a provision for the non-recognition of either gain or loss on a voluntary exchange of certain property "for property of a like kind".

Thus, somewhat curiously, we have had a statutory standard of "like kind" applicable to the voluntary exchange, and the different standard of "related in service or use" applicable to the involuntary conversion. Perhaps, even more curiously and contrary to what one might expect, we have had what seems to be a stricter standard for the non-recognition of gain on the involuntary conversion than we have had for the non-recognition of gain or loss on the voluntary exchange.[4] Senate Report No. 1983, 85th Cong., 2d Sess., pp. 72–3, 1958–3 C.B. 922, 993–4, U.S.Code Congressional and Administrative News, p. 4791; Liant Record, Inc. v. Commissioner, 2 Cir., 1962, 303 F.2d 326; 3 Mertens, Law of Federal Income Taxation, § 20.171, pp. 659–60, and Cum.Supp., pp. 78–9.

It is obvious, nevertheless, that it was the intent of Congress to make provision, within certain limitations, for the non-recognition of gain realized upon the involuntary conversion of property. Winter Realty & Construction Co. v. Commissioner, 2 Cir., 1945, 149 F.2d 567, 569, cert. den. 326 U.S. 754, 66 S.Ct. 92, 90 L.Ed. 452. Our problem is to ascertain, for fact situations of the kind now before us, when such gain, at the election of the taxpayer, may not be recognized.

In construing § 1033(a) and its predecessor statutes the Board of Tax Appeals and the Tax Court developed a functional test. This emerged even though the word "functional" was never in the statute. It is not necessary that the replacement property be an exact duplicate of the original. Cotton Concentration Co., 1926, 4 B.T.A. 121, 126; Henderson Overland Co., 1926, 4 B.T.A. 1088, 1092; M. J. Caldbeck Corp., 1937, 36 B.T.A. 452, 454. See Rev.Rul. 56–347, 1956–R C.B. 518 and Rev.Rul. 58–396, 1958–2 C.B. 403. But the Board and the court followed the routine, and in so doing established the standard, of comparing the actual physical use to which the two properties, original and replacement, were put. The development of the test is apparent from the following comments as they appeared chronologically: "Functionally, the new warehouse replaced the old one". Flaxlinum Insulating Co., 1926, 5 B.T.A. 676, 681. "The test to be applied in determining whether there is a replacement is the character of the service or use. It is not a financial test". Washington Market Co., 1932, 25 B.T.A. 576, 584; Davis Regulator Co., 1937, 36 B.T.A. 437, 443; Winter Realty & Construction Co., 1943, 2 T.C. 38, 53. "Functionally the new building was not similar to or related in use to the old building". Lynchburg Nat'l Bank & Trust Co., 1953, 20 T.C. 670, 673. "Our whole approach * * * has been on the basis of the test of function and purpose, which is inherent in the statutory language, 'similar or related in service or use' ", Gaynor News Co., 1954, 22 T.C. 1172, 1179.

The Internal Revenue Service, not unexpectedly, has followed this interpretation, Rev.Rul. 56–347, 1956–2 C.B. 517; Rev.Rul. 58–245, 1958–1 C.B. 274; Rev. Rul. 58–396, 1958–2 C.B. 403. And the Fourth Circuit in the appeal of the Lynchburg case, Lynchburg Nat'l Bank

3. § 203(b) (1) of the Revenue Acts of 1924 and 1926; § 112(b) (1) of the Revenue Acts of 1928, 1932, 1934, 1936 and 1938; § 112(b) of the 1939 Code; § 1031 (a) of the 1954 Code.

4. § 46(a) of the Technical Amendments Act of 1958, P.L. 75–866, 72 Stat. 1606, added to the 1954 Code its present § 1033(g) which now relates the "like kind" standard to the involuntary conversion of certain real property. This change, made after the taxable year involved in the case before us, is apparently only prospective in operation. §§ 1(c) (1) and 46(a) of the Act; Senate Report No. 1983, 85th Cong., 2d Sess., 1958–3 C.B. 922, 923, 925, 994, 1123; Conference Report No. 2632, 85th Cong., 2d Sess., 1958–3 C.B. 1188, 1219; Filippini v. United States, N.D.Cal., 1961, 200 F. Supp. 286, 294.

& Trust Co. v. Commissioner, 1953, 208 F.2d 757, 758–759, said:

"The Tax Court has held * * * that the test * * * is a functional one; and accordingly the test is not met by the substitution of a building used for banking purposes in place of a building used as a shoe store and a restaurant. To hold otherwise would be to say that the replacement of one commercial building is sufficient under the statute to avoid the recognition of gain, no matter how dissimilar or unrelated their respective purposes may be, and we do not think that the statute has that meaning."

It is to be observed, however, and we think it is important so to observe, that the test emerged when the Board and the court were dealing with fact situations where the taxpayer itself was the actual user, in whole or in part, of the properties. This was so in the following cases where, despite continuing opposition by the Internal Revenue Service on one ground or another, the benefit of the statute was held available to the taxpayer: Cotton Concentration Co., supra, (cotton storage sheds replaced by one larger cotton storage shed); Henderson Overland Co., supra, (lot with excavations and foundations for a structure intended for use as an automobile sales building replaced by a lot already improved with a building suitable for that purpose); Flaxlinum Insulating Co., supra, (warehouse for treating straw for manufacturing purposes replaced by another warehouse); Washington Market Co., supra, (plant, used for rented retail stalls, manufacturing ice, cold storage refrigeration, and lease storage and display space for wholesalers, replaced by property "used in operating the various phases of its business except that of providing stalls for retail market dealers"); Haberland, 1932, 25 B.T.A. 1370 (stock of corporation engaged in textile manufacture replaced by stock of corporation engaged in making sizing materials for sale to textile mills); Davis Regulator Co., supra, (manufacturing business in leased building replaced by same business in building constructed upon land owned by taxpayer); Kimbell-Diamond Milling Co., 1948, 10 T.C. 7 (flour mill replaced by flour and feed processing plant); Massillon-Cleveland-Akron Sign Co., 1950, 15 T.C. 79 (manufacturing plant replaced by plant devoted to similar manufacture but with dissimilar proportional use of proceeds to replace destroyed equipment and machinery); and Gaynor News Co., supra, (unimproved real estate acquired for erection of plant replaced by other real estate with existing improvements partially usable for the new plant) where, however, the court said, p. 1177 of 22 T.C., " * * we think it unrealistic to set up a functional classification in terms of improved or unimproved property".

The same is true of the following cases where the issue was decided against the taxpayer: Winter Realty & Construction Co., supra, (real property replaced by mortgages on real property); Lynchburg Nat'l Bank & Trust Co., supra, (building, leased to shoe store and restaurant on adjoining property, acquired for the construction of a bank addition and replaced, after fire, with that addition); and Collins, 1958, 29 T.C. 670 (property used for a poultry business replaced by residence rental property and a gasoline service station).

These cases are the instances where the functional use test appeared and developed. In each of them the particular taxpayer's use of at least one of the properties was the end or ultimate use and, for purposes of the statute, the end uses were then compared.

The Tax Court, however, has not confined its application of the functional use test to situations where the taxpayer is the end user. It has extended this comparative use approach to instances where the taxpayer's interest in both the original and the replacement properties was not that of end user and where the end users were other persons, as, for example, lessees of the taxpayer.

Thus, the fact that both properties were investment assets, in the sense that

they were merely held for the production of income, as contrasted with use in the conduct of the taxpayer's own active commercial business, has not dissuaded the Tax Court from applying the functional test to the end uses. It is not enough, so far as that court is concerned, that one investment property is replaced with another investment property. Winter Realty & Construction Co., supra; Steuart Bros., Inc., 1957, 29 T.C. 372, 375–377 (property on which it was planned to erect rented warehouses replaced by rented properties improved with garages, service stations, and automobile sales rooms); McCaffrey, Jr., 1958, 31 T.C. 505, 509 (property leased for parking lots replaced by property leased for warehouse purposes with incidental occupancy parking); Liant Record, Inc., 1951, 36 T.C. 224 (office building replaced by apartment buildings containing some commercial space); Clifton Investment Co., 1961, 36 T.C. 569 [now on appeal to the Sixth Circuit] (office building replaced by hotel with some rented commercial space); E. Pohn, 1961, 20 T.C.Memo 1632 [now on appeal to the Seventh Circuit] (leased filling station replaced by leased apartment); and Capitol Motor Car Co., 1962, T.C.Memo 1962–64 (leased improved real estate replaced by unimproved land leased to a corporation to construct a motel). Again the Internal Revenue Service has followed. G.C.M. 14693, XIV–1 C.B. 197 (1935); Rev.Rul. 56–347, 1952–2 C.B. 517.

More specifically, in those cases which concern a taxpayer-lessor, the Tax Court again has been unimpressed with any argument that rental properties as such are "similar or related in service or use" regardless of the end use to which those properties are put by the taxpayer's respective lessees. Steuart Bros., Inc., supra, pp. 375–376 of 29 T.C., where it was said, "Something more than the fact that both properties * * * were held for the purpose of deriving operating profits, rental income, or interest income is required * * * [W]e have adhered to what has been referred to as a 'functional' test and we see no reason in departing from this construction of the statute"; McCaffrey, Jr., supra, p. 509 of 31 T.C.; Liant Record, Inc., supra; E. Pohn, supra; Capitol Motor Car Co., supra. Nevertheless there have been indications to the contrary. See M. J. Caldbeck Corp., supra, p. 454 of 36 B.T.A.; Winter Realty & Construction Co., supra, 2 T.C. 38 (as to the $51,116.25 issue); and the 3-judge dissent in the Lynchburg case, supra, p. 674 of 20 T.C.

When, however, appeals have been taken from these Tax Court decisions, and the reviewing courts have been confronted with the factual interposition of the investment element or, specifically, of the taxpayer-lessor relationship, the functional end-use test has had rough going indeed and the results have not been consistent.

The Steuart case was reversed on appeal. Steuart Bros., Inc. v. Commissioner, 4 Cir., 1958, 261 F.2d 580. The Fourth Circuit there emphasized the investment character of the properties with respect to the taxpayer. It recognized the relevancy of comparative end uses if the taxpayer was in possession and itself was the actual user. But it noted that this was not the situation then before it and said, p. 583:

"It held them for an investment exactly as it had previously held the condemned properties; and it is manifest that the purpose of the statute will be served if the taxpayer is not compelled at this time to recognize the gain which it was compelled to realize by the condemning power."

The court seems to have held the statute applicable on this investment basis alone, although it did close its opinion with a reference to "real estate of the same general class". The taxpayer's lessor status appeared not so important as its investor status. It is interesting to note that the Steuart opinion was written by Judge Soper who had prepared the court's opinion in its earlier Lynchburg case, supra, where the func-

tional use test had been applied to a taxpayer's own active use.

The McCaffrey case, in contrast, was affirmed on appeal. McCaffrey v. Commissioner, 3 Cir., 1960, 275 F.2d 27, cert. den. 363 U.S. 828, 80 S.Ct. 1598, 4 L.Ed.2d 1523. The Third Circuit specifically rejected the argument that both properties were investment and industrial assets. It also was unimpressed with the taxpayer's particularized lessor status. It said, pp. 29–30 of 275 F.2d:

"The fact that taxpayer 'used' the money invested in the old and new properties for the similar purpose of producing rental income does not bring into play the non-recognition of gain provisions * * * and is impertinent to its application."

It looked to the lessees' ultimate uses of the properties and thus followed the Tax Court. It was unable to agree with the Fourth Circuit in focusing on use by the taxpayer as distinguished from use by its tenants.

The Liant case, on the other hand, was also reversed. Liant Record, Inc., 2 Cir., 1962, 303 F.2d 326. The Second Circuit there noted the difference in approach of the Fourth Circuit in Steuart and of the Tax Court and the Third Circuit in McCaffrey and stressed the statute's application to the taxpayer and not to the end user. It said, p. 329 of 303 F.2d:

"* * * [I]t is the service or use which the properties have to the taxpayer-owner that is relevant. * * * [I]f the taxpayer-owner is an investor rather than a user, it is not the lessees' actual physical use but the nature of the lessor's relation to the land which must be examined. * * * There is, therefore, a single test to be applied to both users and investors, i. e., a comparison of the services or uses of the original and replacement properties to the taxpayer-owner. In applying such a test to a lessor, a court must compare, inter alia, the extent and type of the lessor's management activity, the amount and kind of serv-

ices rendered by him to the tenants, and the nature of his business risks connected with the properties."

In making this statement the Second Circuit remained in line with Judge Learned Hand's reliance on management, security, and income when, sixteen years earlier, he said in the Winter case, supra, p. 570 of 149 F.2d:

"* * * Congress meant to suspend the tax only when an owner, forced out of one investment, found an equivalent investment, * * * either as to its management, as to the security which it affords, or as to the return obtained from it."

There is, in addition, the District Court case of Filippini v. United States, N.D.Cal.1961, 200 F.Supp. 286. There the original property consisted of land leased for farming but with a portion leased to a drive-in theatre. The replacement property consisted of lots improved with a commercial office building rented to various tenants. The court endeavored to effect some reconcilement between the Steuart and McCaffrey cases, placed little emphasis on lessor status but, accepting investor status, looked to a standard of the "same general class". It decided the issue against the taxpayer.

In summary, then, we may say, with respect to the taxpayer-lessor situation, that the courts thus far have taken four approaches: The first, exemplified by McCaffrey, extends the functional use test to this situation and would have the lessor's tax consequences be governed by its respective lessees' end uses of the properties. The second, illustrated by Steuart, primarily recognizes that it is the lessor, not the lessee, whose tax is at issue and to whom § 1033(a) must be applied; as a consequence, it emphasizes the lessor's investment status and seems to be content when it finds investment character in both properties. The third, represented by Filippini, gives recognition to the approaches of both McCaffrey and Steuart, regards their conflict as "more apparent than real", takes hold of

"the same general class" phrase appearing at the end of the Steuart opinion, and employs that phrase as the basis of its own analysis. The fourth, represented by Liant, stresses the service or use which the properties have to the taxpayer-lessor, not the lessees, and regards this as the governing test to be measured by management activity, services rendered to the tenants, and business risk.

We feel, as the Fourth Circuit obviously did in Steuart and as the Second Circuit did in Liant, that the statute must be viewed in the light of its application to the taxpayer and that it is to be tested by the taxpayer's activities and not by those of its tenants or other persons. If McCaffrey goes beyond this— and it and the Tax Court cases certainly appear so to do—to that extent we disagree with it. If, moreover, Steuart stands for the proposition, at the other end of the spectrum, that § 1033(a) applies if the properties in question only qualify as investments, then we also shrink from the extremity of that holding. We feel that something more than mere investment character is required, for the statute by its terms was clearly intended to have some limitation of application and could not have been designed to free the taxpayer-investor from tax on gain realized upon every conceivable involuntary disposition and replacement of investment property. If this were not so, it would then be possible to have a situation where the statute is available even though the taxpayer's own activity is completely changed upon the conversion. Example: Lease of a building used for manufacturing replaced by the taxpayer's own identical and direct manufacturing operation. This does not seem to us to be the sense of the statute.

We think, then, that it is proper to require an aspect of similarity beyond mere investment character. We find attraction in Steuart's and Filippini's "same general class" approach and particularly in Liant's comparison of the services or uses which the properties have to the taxpayer-owner. We say only that, for the benefit of the statute

to be available to the taxpayer-lessor, the respective lessees' end uses are not determinative and that it is sufficient if, coupled with the leasehold characteristic of the taxpayer's properties, there is also a reasonable similarity in the leased premises themselves. This approach gives effect to the statute's relating the properties concerned, as distinguished from their employment by the ultimate user, to the requirement that they be "similar or related in service or use".

Accepting this as our standard, we have no difficulty in concluding that there was reasonable similarity, in their relationship to this taxpayer-lessor, between the leased Pine Street property and the leased Forest Park property. Each was rented, commercial and industrial. The distinction between manufacturing and warehousing in this context does not impress us. More specifically, too, and for the additional weight it affords, the two properties meet the "same general class" standard of Steuart and Filippini; they meet the "comparison of the services or uses" test of Liant, when one compares the taxpayer's management activities, the services rendered by it to the tenants, and the nature of the business risks; and they certainly meet the pure investment approach of Steuart.

We have had in mind the fact that even the Board and the Tax Court, in evolving the functional use test and in applying it strictly and extremely, have said that the statute was not intended to penalize but to protect persons whose property may be taken on condemnation, Washington Market Co., supra, p. 584 of 25 B.T.A., and, repeatedly, that this statute embraces relief provisions and is to be construed liberally in order to effectuate its purpose. Haverland, supra, p. 1378 of 25 B.T.A.; Buckhardt, 1935, 32 B.T.A. 1272, 1277; Davis Regulator Co., supra, p. 442 of 36 B.T.A.; Washington Railway & Electric Co., 1939, 40 B.T.A. 1249, 1257; Massillon-Cleveland-Akron Sign Co., supra, p. 83 of 15 T.C.; Nehi Beverage Co., 1951, 16 T.C. 1114, 1119; and Gaynor News Co., supra, p. 1177 of 22

T.C. See, also, the holding in Masser, 1958, 30 T.C. 741. We feel that our holding is a properly liberal one and not an unwarrantly extreme one.

We therefore conclude that the Tax Court's finding that the properties here were not "similar or related in service or use" is clearly erroneous and that its decision that this taxpayer is not entitled to the non-recognition provisions of § 1033(a) (3) (A) may not stand. The decision is reversed and the case is remanded for redetermination, in accord with the views herein expressed, of the taxpayer's 1955 tax.